IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

MICHAEL MAESTAS, THOMAS MAY,
JUANITO MARQUEZ, and JAHMAAL GREGORY,
on behalf of themselves and all others similarly situated,

      Plaintiffs,

v.                                    No. 1:09-cv-19 JH/LFG

DAY & ZIMMERMAN LLC,
and SOC LLC,

      Defendants.

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT**

Defendants Day and Zimmerman LLC and SOC LLC (collectively "SOC"), hereby move for Summary Judgment on Plaintiffs Maestas, Marquez, Gregory and May's (collectively "Plaintiffs") claims pursuant to the Fair Labor Standards Act, 29 U.S.C. §201, *et. seq*. ("FLSA"). Plaintiffs allege they have been misclassified as exempt employees and are owed overtime. *Complaint at* ¶¶16, 20. Plaintiffs allege that their job duties do not satisfy the FLSA's executive or administrative exemptions. *Complaint at* ¶20. Instead, Plaintiffs contend their job duties make them non-exempt "first responders" as defined by FLSA regulation 29 C.F.R. § 541.3. The undisputed material facts show that (1) Plaintiffs are not "first responders", thus they are properly classified as exempt from the FLSA's overtime requirements, and (2) their primary duties meet the requirements for the executive, administrative, or combination exemptions.

I.     **UNDISPUTED ISSUES OF MATERIAL FACT ("UMF")**

     A.     **Facts Common to All Plaintiffs**

     1.     Los Alamos National Laboratory ("LANL") contracts with SOC for security of

the laboratory facilities located in Los Alamos, New Mexico. *Deposition of William Starkovich, FOD Manager, Exhibit 1, pp. 5:15-16, 6:2-25*. Pursuant to the contract SOC provides paramilitary security and protection of the people, facilities, and information located within the 43 square mile LANL facility. *Id. pp. 7:25-9:1*.

2.      SOC employs non-exempt, union, security police officers (SPOs) and security officers (SOs), whose terms of employment are governed by a collective bargaining agreement (CBA). *Deposition of Alfonso Gonzales, HR Manager, Exhibit 2, pp. 4:23-24, 5:14-20, 11:1-17*.

3.      Plaintiff Maestas is a FOD ("Field Operations Division") Lieutenant.  Plaintiff Marquez is a SASS ("Shift Administration & Systems Supervisor") Lieutenant. Plaintiff Gregory is a Captain. Plaintiff May is a Major. Majors supervise Captains, who supervise Lieutenants, who supervise SPOs and SOs. *May Depo., Exhibit 3, p. 27:9-19; Maestas Depo., Exhibit 4, pp. 39:13-40:2*.

4.      Plaintiffs admit they are supervisors. *Maestas Depo., Ex. 4, p. 57:19-21; Marquez Depo., Exhibit 5, p. 69:16-18; Gregory Depo., Exhibit  6, p. 20:1-18; May Depo., Ex. 3, pp. 10:25-11:2*.

5.      There are approximately 6 Majors, 6 FOD Captains, 6 SOD ("Special Operations Division") Captains, 27 FOD Lieutenants, 6 CASS ("Central Alarm System Supervisors") Lieutenants, and 6 SASS Lieutenants. *Starkovich Depo., Ex. 1, pp. 16:23-24, 18:17-19, 22:2-9, 23:16-20*.

6.      SOC's operations are divided into four zones. Within each zone, there are posts. Each post is staffed by an SPO or SO, and has a different function.  *Starkovich Depo., Ex. 1, pp. 13:19-14:4, 32:24-33:8, 47:16-48:5*.

7.      There are three shifts at SOC: graveyard shift (11:00 p.m. to 7:00 a.m.), day shift

(7:00 a.m. to 3:00 p.m.), and swing shift (3:00 p.m. to 11:00 p.m.). *Starkovich Depo., Ex. 1, p. 13:19-22.* Each shift is run by a Major and supervised by a Manager. *Id. p. 6:4-9.*

8.      Protective force employees must obtain and maintain certain certifications, depending on the level of the position. Lieutenants, Majors, and Captains (collectively "Supervisors") must maintain all of the certifications that SPOs have, plus additional supervisory training. *May Depo., Ex. 3, pp. 45:13-46:13; Marquez Depo., Ex 5, p. 21:13-24; Gregory Depo., Ex. 6, pp. 9:7-20, 18:12-19:1.* Supervisors maintain these certifications in order to be effective supervisors of the SPOs and SOs who carry out the response duties, and so they can act appropriately if it is not possible for them to remain in charge in an emergency. *May Depo., Ex. 3, pp. 45:13-46:15.*

9.      Once promoted to Lieutenant, the employee must complete a PTLA[1]-specific Supervisor Basic Course and Supervisor on-the-job training. *Maestas Depo., Ex. 4, p. 23:1-20; Gregory Depo., Ex. 6, pp. 9:7-20, 19:14-25.* The Supervisor Basic Course lasts approximately three weeks. *Gregory Depo., Ex. 6, pp. 9:21-10:1.* The course covers an extensive number of topics, including: Equal Employment/Affirmative Action and Sexual Harassment for Supervisors; PTLA Supervisors Responsibilities; Ethics of Management for Supervisors; Introduction to Leadership Skills; Situational Leadership II; Zone Scheduling; Post Management; CBA Pre-Discipline; CBA Grievance and Arbitration; Fitness for Duty; Supervisor Responsibilities for Employee Assistance Program; Incident Investigation and Reporting; On the Job Training; Performance Testing and Performance Assessments; Coaching Techniques; and Officer in Tactical Command. *Course Syllabus, Exhibit 7.* Each of the Plaintiffs completed the course when he was promoted to Lieutenant. *1/7/05 Memo re: Maestas, Exhibit 8; Marquez Depo., Ex. 5, p. 69:16-18;*

---

[1] PTLA, or Protection Technology Los Alamos, was the prior name of SOC LLC. *Starkovich, Ex. 1, p. 6:19-25.*

*6/8/05 Memo re: Gregory, Exhibit 9; May Depo., Ex. 3, pp. 19:12-16.*

10.    Supervisory experience is a minimum qualification for a Lieutenant position. *Field Lieutenant Job Posting, Exhibit 10.*

11.    SOC periodically provides Supervisors with a copy of their job descriptions to review and correct. Supervisors are asked to sign and date the job descriptions once they have reviewed them. *Maestas Depo., Ex. 4, p. 24:3-10; Marquez Depo,. Ex. 5, pp. 12:18-13:11.*

12.    Plaintiffs contend they are first responders because (1) the scope of the job means they could be called upon to serve as officers in tactical command at any time, (2) they have the same certifications that SPOs and SOs have; (3) they are highly trained, (4) the type of response that is required of them is not something local law enforcement can do, (5) they have a high clearance, including the Human Reliability Program (HRP), and (6) they are the first persons called when there is a security threat or emergency. *May Depo., Ex. 3, pp. 39:12-40:5, 40:8-41:1.*

### B.    Lieutenant Michael Maestas' Job Duties

13.    Maestas was hired by SOC as a SPO in September 2002. Maestas was promoted to FOD Lieutenant in October 2004 and has remained in that position. Maestas is currently supervised by Plaintiff Gregory. *Maestas Depo., Ex. 4, pp. 6:12-13, 10:1-6, 10:14-22, 61:25-62:7.*

14.    SOC relied on Maestas' seventeen years of supervisory experience in the U.S. Armed Forces in promoting him to FOD Lieutenant. *Maestas Depo., Ex. 4, pp. 21:25-22:20; Salary Worksheet, Exhibit 11.*

15.    Maestas received a 10% raise when he was promoted to FOD Lieutenant. *Maestas Depo., Ex. 4, p. 21:4-15.*

16.    Maestas is responsible for the supervision of uniformed security personnel such as

SPOs and SOs. *FOD Lieutenant Job Description, Exhibit 12.* He supervises a varying number of SPOs, depending upon the zone and shift he is assigned to. *Maestas Interrogatory Number 3, Exhibit 13.*

17.     The primary role of a Lieutenant is to make sure that the people under their supervision are prepared to handle any situation at any time. *May Depo., Ex. 3, p. 42:3-23.*

18.     SOC expects the Lieutenants such as Maestas, when at all possible, to remain in charge as opposed to personally engaging the threat. *May Depo., Ex. 3, p. 45:7-12.*

19.     Maestas confirmed that the Lieutenant job description accurately describes his job. *Maestas Depo., Ex. 4, pp. 25:3-26:1, 41:16-42:21, 65:4-14.* The job duties include, among other things: inspecting personnel during formation to ensure subordinates have all equipment and identification for duty; inspecting posts and vehicles for damage; monitoring fitness for duty of assigned personnel; supervising weapons and equipment issue rooms; reviewing and verifying timesheets for subordinates as well as patrol reports; performing post checks; creating and filing incident reports; documenting and recommending disciplinary action; creating schedules; conducting daily security exercises; training new personnel on procedures, requirements and hazards; interpreting policies and instructing subordinates; and providing assistance for emergency management of security and safety incidents. *FOD Lieutenant Job Description, Exhibit 12.*

20.     During the shift Maestas checks each post and verifies that each post is staffed properly. If a post is not staffed properly, he must be prepared to step in, until it can be filled. *Maestas Depo., Ex. 4, pp. 11:21-13:1.*

21.     In an emergency, the role of the Lieutenant is to assess the situation, prepare for arrival of emergency responders or otherwise appropriately respond to the situation by deploying troops to their positions. *Id., pp. 56:2-57:18*; *May Depo., Ex. 3, p. 42:16-23; Marquez Depo., Ex.*

*5, pp. 32:4-33:12, 34:23-35:14.* The purpose of a lieutenant is to make that assessment and determine whether deployment needs to take place. The "other stuff" such as making routine patrols, checking on containers, and things of that nature is "secondary." *May Depo., Ex. 3, p. 42:3-23.*

22.    Lieutenants conduct and supervise alarm maneuvers.  When an alarm sounds the Lieutenants are notified. The Lieutenants exercise their discretion and independent judgment to decide the best use of manpower and equipment to respond to the call. *Maestas Depo., Ex. 4, pp. 13:16-14:3.* For example, Lieutenants determine whether SPOs are at their correct posts and, if they are not, assess the situation to determine what action to take.  The actions Lieutenants may take, based on their discretion, include repositioning SPOs, filling in at a post themselves, investigating the cause of the alarm, or requiring SPOs to investigate the alarm. *Id., p. 14:11-24; May Depo., Ex. 3, pp. 12:9-13, 13:2-22.*

23.    During formation Lieutenants conduct visual "fitness for duty" examinations of the SPOs to look for signs of illness, alcohol abuse, or other distraction that would threaten an SPO's ability to perform their tasks. *Maestas Depo., Ex. 4, pp. 26:13-22.* Lieutenants have the authority and responsibility to remove from duty any SPO they determine is not fit for duty. If any Lieutenant concludes through their experience and observation that an SPO is not fit for duty, he is to notify his Major. *Id., pp. 26:25-27:5; May Depo., Ex. 3,  pp. 53:16-54:16.*

24.    Following an incident such as removing an SPO from duty, Lieutenants are responsible for completing a Point of Observation Report ("POR"). PORs are used to report and investigate injuries, loss of equipment, or SPO policy violations that might result in disciplinary action. Lieutenants may recommend disciplinary action or they may determine that disciplinary action is not needed. *Maestas Depo., Ex. 4, pp. 28:2-29:8.*

25.     In November 2008, Maestas completed a POR for an SPO who had been late in completing his patrol rounds. During his investigation of the incident Maestas discovered that the SPO had misinterpreted a General Security Order ("GSO") that specified the number of minutes permitted between checks. Based on his experience, Maestas concluded the GSO was confusing, raised it with his supervisors and was successful in changing the procedure. He used his judgment to recommend a pre-disciplinary letter for the SPO because the SPO had an exemplary record and the GSO was confusing. *Maestas Depo., Ex. 4, pp. 65:16-66:20, 66:23-68:12, 69:7-17.*

26.     The decisions of Lieutenants can be grieved by the SPOs and SOs. Should a Lieutenant's decision be grieved by a SPO, the Lieutenant is required to represent management in the grievance process.  *Maestas Depo., Ex. 4, p. 88:2-20.*

27.     On a daily basis, Lieutenants conduct Daily Security Exercises ("DSEs") (now called On Shift Performance Assessments or "OSPAs") with their SPOs to verify that security procedures were memorized and performed correctly.  *Maestas Depo., Ex. 4, pp.  36:4-19.* If an SPO fails an exercise, Lieutenants have the discretion to retrain them on the spot, require remedial training, remove them from duty, or recommend disciplinary action. *Id., pp. 37:5-14, 37:19-25.*

28.     Lieutenants must administer at least two OSPAs per day, but may conduct more in their discretion. *Maestas Depo., Ex. 4, pp. 38:22-39:6.* Maestas was commended for conducting 133 OSPAs on his subordinates in January 2006. *2/3/06 Memo*, *Exhibit 14.*

29.     Lieutenants participate on hiring panels for SPO candidates. In August of 2006, Maestas served on a hiring panel for six SPO candidates. *8/21/06 Interview Schedule, Exhibit 15.* Lieutenants use their own experience and independent judgment to evaluate the candidates and to score their answers to interview questions. Their hiring recommendations are generally followed. *Maestas  Depo., Ex. 4, pp. 43:3-10; 43:19-44:12.* Non-supervisory employees do not serve on

hiring panels. *Starkovich Depo., Ex. 1, p. 91:4-8.*

30.     From November 2008 to April 2009, Maestas also served as a Field Training Supervisor ("FTS"). FTSs train new patrol officers and lieutenants and teach them the requirements and procedures of their assigned zone. Maestas has continued to train new SPOs informally since his FTS duties ended. *Maestas Depo., Ex. 4, pp. 35:5-22, 63:11-13, 64:4-9.*

31.     All members of the protective force have arrest authority and their security badges contain a red stripe giving them access to respond to the location of any emergency at the Lab facility. *Maestas Depo., Ex. 4, pp. 50:1-5, 50:17-51:7.*

32.     In the event of a medical emergency, such as a heart attack, the Lieutenant calls 911, alerts headquarters of the incident, opens the gate for emergency personnel and assigns SPOs to man their stations for the patient's transport. To date, Maestas has not been involved in or responded to such a scenario. *Maestas Depo., Ex. 4, pp. 51:61-17, 52:7-18, 52:22-53:7.*

33.     In the event of an emergency (for example, identification of a suspicious package), the role of the Lieutenant is to coordinate the positions of the SPOs and act as facilitator for the entry of Los Alamos Police, Fire, and other emergency personnel to the scene. *Maestas Depo., Ex. 4, pp. 54:1-55:9, 56:2-23, 57:2-18.*

34.     Although lieutenants might be the people to "actually stumble" on a situation or be the first called about it, their primary responsibility and function is to remain in charge whenever possible. *May Depo., Ex. 3, pp. 41:11-23, 45:7-12.*

35.     Supervisors are trained to serve as "Officer in Tactical Command" – the person who calls the shots in a security situation. Hourly employees do not have OTC training.  *May Depo., Ex. 3, pp. 46:16-47:14.*

36.     The nature of the work and materials at LANL brings with it unique safety and

security threats that are beyond what local law enforcement handle and as to those threats the protective force is "it." The Lieutenants are trained to direct the SPOs and SOs to respond in those situations, and remain in charge whenever possible. *May Depo., Ex. 3, pp. 47:15-48:12.*

  **C.**  **SASS Lieutenant Juanito Marquez' Job Duties**

  37.  Marquez was hired by SOC as a SPO II in January 2005 and promoted to SASS Lieutenant in September 2006. *Marquez Depo., Ex. 5, pp. 16:21-17:8, 19:17-25.*

  38.  The job of SASS Lieutenant requires a minimum of a year of supervisory experience. *SASS Lieutenant Job Description, Exhibit 16.*

  39.  Marquez received a 10% raise when he was promoted to SASS Lieutenant. *Marquez Depo., Ex. 5, p. 21:6-10.*

  40.  Marquez agrees the job description is accurate except that as a SASS Lieutenant, he does not conduct formal performance reviews. *Marquez Depo., Ex. 5, pp. 47:9-24, 72:11-22.* The essential job duties include, among other things: inspecting personnel during formation to ensure subordinates have all equipment and identification for duty; monitoring fitness for duty of assigned personnel; establishing daily schedules of FOD personnel; identifying and assigning open posts for staffing; accounting for firearms and equipment issuance; training subordinates on specific duties; interpreting policies and instructing subordinates; creating bi-weekly schedules and Daily Activity Reports; preparing and submitting Daily Strength and Accountability Reports, and unbudgeted overtime reports; handling employee grievances; conducting investigations; and recommending and documenting disciplinary actions as needed. *SASS Lieutenant Job Description, Ex. 16.*

  41.  In his role as SASS Lieutenant, Marquez is responsible for scheduling the SPOs and SOs, handling requests for time off, ensuring that the CBA provisions are followed and enforced as to overtime and other assignments, quickly responding to changes in personnel availability during

a shift, ensuring that each post is staffed with an SPO or SO who has the required certifications for that post. *Marquez Depo., Ex. 5, pp. 39:4-40:18, 41:8-13, 45:17-46:6, 48:22-49:15.* The primary duty of a SASS Lieutenant is serving as the "scheduling specialist". *Id., p. 50:7-12; Starkovich Depo., Ex. 1, p. 24:1-10.*

42.     When a post is available, sometimes SPOs say they want to fill it, but Marquez makes the determination as to whether the SPO has the necessary certifications and eligibility compared to other SPOs pursuant to the CBA. *Marquez Depo., Ex. 5, p. 40:1-41:7.* He personally deals with the requests for time off and determines if the employees are eligible, and if so, who should fill the open slot. *Id., pp. 48:22-49:7.* Though he gets input from Captains regarding the shift scheduling, the determinations of which SPO or SO can or should be called to fill a vacant post lies with him. *Id., p. 41:8-13.*

43.     The SASS Lieutenant has discretion to respond to issues arising during fitness-for-duty inspections, such as when a SPO with a mobile unit has forgotten his driver's license, in which case the SASS Lieutenant will reorganize the post assignments according to his discretion. *Marquez Depo., Ex. 5, p. 41:14-21, 41:24-42:17.* If subordinates forget their equipment, the SASS Lieutenant can initiate disciplinary action. *Id., pp. 80:10-81:15.*

44.     The SASS Lieutenants' staffing decisions may be, and have been, grieved by the union employees. *Marquez Depo., Ex. 5, pp. 46:22-47:5; Gregory Depo., Ex. 6, pp. 67:22-68:2.*

45.     Marquez' job is a hybrid of FOD and SASS Lieutenant duties, referred to as "adjunct lieutenant". *Marquez Depo., Ex. 5, pp. 21:11-22:9.* Marquez worked as a SASS Lieutenant until he was asked to fill in on the graveyard shift as either a FOD or SASS Lieutenant as needed in September, 2006. *Id., p. 67:2-15; Marquez Interrogatory Number 5, Exhibit 17.* Marquez remained on the graveyard shift until February 2010, when he switched to the swing

shift, retaining his hybrid duties. *Id., pp. 68:25-69:5.* Marquez spends approximately 50 to 60% of his time in the field performing the duties of an FOD Lieutenant, and the remainder of his time in the office performing SASS Lieutenant duties. *Marquez Depo., Ex. 5, pp. 21:22-22:9, 67:7-15.*

46.     In his hybrid role Marquez is responsible for sharing the supervision of all field uniformed security personnel with other FOD Lieutenants. *Marquez Depo., Ex. 5, pp. 62:25-63:12; Marquez Interrogatory Number 3, Exhibit 17.* His FOD Lieutenant duties are the same as those performed by Lieutenant Maestas, described above. *Marquez Depo., Ex. 5, pp. 32:4-33:7.*

47.     In October 2007, Marquez received an exceptional performer award for the high level of service he provided to the troops and for taking initiative in his leadership role without the involvement of the Majors. *Marquez Depo., Ex. 5, pp. 69:22-70:23.*

48.     In an emergency such as a fire, Lieutenants do not personally engage the threat, but wait for the "professionals". *Marquez Depo., Ex. 5, pp. 84:24-85:16.*

49.     Marquez reviews patrol reports submitted by SPOs and SOs in the field to make sure that the times listed for each patrol or check are consistent with the GSO-allowed time for each activity. If a patrol report is incomplete or incorrect, Marquez has the discretion to recommend disciplinary action. *Marquez Depo., Ex. 5, pp. 63:13-24, 64:7-65:6.*

50.     Marquez has completed PORs for individuals assigned to him when those individuals committed infractions. Marquez can exercise his judgment in determining whether to take disciplinary action for infractions. *Marquez Depo., Ex. 5, pp. 65:15-66:9-16.*

51.     In February 2008, Marquez completed a POR for James Roybal, an SPO who had failed to show for required training. Marquez investigated, recommended that a Letter of Reprimand ("LOR") be issued as discipline, and wrote and issued the LOR to Roybal. *Marquez Depo., Ex. 5, pp. 75:13-76:6, 76:10-19, 77:25-78:13; 2/8/08 POR, Exhibit 18.*

11

52.    In the event of a conflict or argument between two SPOs, it is Marquez's job to investigate the incident and recommend disciplinary action, if appropriate. *Marquez Depo., Ex. 5, p. 87:11-18.*

53.    Marquez has the discretion to issue verbal orders ("VODO"s) to subordinates in order to complete the tasks at hand. *Marquez Depo., Ex. 5, p. 47:6-8.*

**D.    Captain Jahmaal Gregory's Job Duties**

54.    Gregory was hired by SOC as a SPO in 2003 and promoted to FOD Lieutenant in September 2004. He had prior supervisory experience as a federal probation officer, where he supervised four (4) people. *Gregory Depo., Ex. 6, pp. 8:15-24, 20:6-15.* Gregory was promoted to FOD First Lieutenant (now titled Captain)[2] in April 2007. *Gregory Depo., Ex. 6, p. 8:4-9.*

55.    Gregory was demoted to Lieutenant for approximately twelve months. He was promoted to Captain again about eighteen months ago. *Gregory Depo., Ex. 6, pp. 59:6-60:18.*

56.    The FOD Lieutenant Job Description accurately describes the duties Gregory had as a Lieutenant. *Gregory Depo., Ex. 6, pp. 17:9-18:15, 19:2-8, 84:2-22.*

57.    The job of Captain differs from the job of Lieutenant because of the greater supervisory authority in the duties of a Captain. *Starkovich Depo., Ex. 1, p. 65:5-13.* Gregory is assigned to Zone 1, the highest security location at the facility, and is responsible for the supervision of all shift troops at that location. He oversees three Lieutenants and fifteen SPOs in Zone 1, and he works the swing shift. *Gregory Depo., Ex. 6, pp. 25:12-26:6, 26:18-21, 27:2-14.*

58.    The Captain position exists to take charge of any situation. *Gregory Depo., Ex. 6, p. 36:14-25.* In the event of an emergency or security incident, a Captain first receives the report by

---

[2] SOC changed the nomenclature of the supervisor positions in December, 2008.  Second Lieutenants were re-titled Lieutenants, First Lieutenants were re-titled Captains and Captains were re-titled Major. The duties and responsibilities did not change. *Starkovich Depo., Ex. 1, pp. 62:18-64:15.*

12

radio from the SPO at the location of the incident. The Captain goes to a remote location and orchestrates the response of the field troops. *Id., pp. 31:23-33:10, 33:21-34:4.* As a Captain, Gregory would not be involved in personally addressing a threat unless it was in his immediate vicinity. *Id., p. 37:1-6.* In emergencies, Gregory's presence is mandatory in order to ensure that the troops properly execute their tasks. *Id., p. 31:2-22.*

59.     Gregory schedules SPOs and fills the shifts according to the SPOs and SOs that he has determined work best together. *Gregory Depo., Ex. 6, pp. 27:15-28:15.*

60.     Some of Gregory's essential job duties include: supervising the activities and responsibilities of the FOD/SOD Lieutenants; implementing the directives of the Management office; prioritizing the daily work of assigned personnel; conducting training and procedure drills; deploying and managing personnel during responses; reviewing and verifying patrol reports; interpreting policies and procedures; and recommending changes or discipline. *Captain Job Description, Exhibit 19.* Gregory agreed that his job description is accurate except that he does not schedule leave time for or review the time sheets of his subordinates, he has not participated in handling grievances, and he does not review the report logs for DSEs. *Gregory Depo., Ex. 6, pp. 54:10-55:5, 64:18-65:2, 69:4-8.*

61.     If a subordinate grieves a Captain's or Lieutenant's decision, the Captain may be required to represent management during the proceedings. *Gregory Depo., Ex. 6, pp. 67:22-68:10.*

62.     Gregory completes Reports of Inquiry ("ROI"s) for accidents and injuries. He conducts investigations, takes statements and makes recommendations to upper management as to how to avoid further incidents. Gregory completes PORs for subordinates who have engaged in misconduct and he recommends discipline. *Gregory Depo., Ex. 6, pp. 80:21-82:14.*

13

63.    In February 2008, Gregory completed an ROI for an SO, and recommended corrective counseling as discipline. His recommendation was followed. *2/28/08 ROI, Exhibit 20*.

64.    As Captain on shift, Gregory serves as the Officer in Tactical Command ("OTC"). Gregory supervises the force-on-force exercises and procedures, and the response to any emergency or threat.  As the OTC Gregory is the lead commander in the field, ensuring that all safety and security procedures are executed astutely and correctly during a threat. *Gregory Depo., Ex. 6, pp. 29:21-30:24.* Gregory and other Captains have input on the development of the exercises, security orders and procedures. *Id., p. 64:2-14*.

### E.    Major Thomas May's Job Duties

65.    May was hired by SOC as a SPO in August, 2006, and promoted to FOD Lieutenant in September, 2006. *May Depo., Ex. 3, pp. 8:15-21, 9:2-6.* May's Lieutenant duties were materially the same as Lieutenants Maestas and Marquez's. *Id., pp. 13:2-22, 41:24-42:23.*

66.    May's prior supervisory experience included three years in the Army and six (6) years with the Colorado Department of Corrections, where he supervised ten (10) people. *May Depo., Ex. 3, pp. 10:5-13, 64:8-24.*

67.    May was promoted to Major in October 2009. *May Depo., Ex. 3, pp. 11:20-23.* As a Major, May is the highest-ranking person in the field during a shift. *Id., p. 27:9-11.*

68.    As the Major on duty, May is responsible for the supervision of approximately eight supervisors in addition to forty other personnel at a time. *May Depo., Ex. 3, pp. 64:25-65:13*.

69.    May confirmed that his job description is accurate but is missing his Weapons and Equipment Room ("WEIR") duties, training and re-training duties, and certification and physical fitness maintenance. *May Depo., Ex. 3, pp. 56:18-57:18.* Some of May's essential job duties include: supervising FOD/SOD Captains and Lieutenants; overseeing staffing requirements and

leave requests; facilitating meetings with Captains and Lieutenants; managing shift personnel; providing administrative oversight by reviewing and verifying reports; interpreting policies and instructing subordinates; reviewing policies and procedures and recommending changes as needed; providing emergency management of security and safety incidents; assigning and monitoring tasks performed by subordinates; conducting and assisting with internal audits; reviewing and verifying timesheets and wellness tracking for all FOD/SOD personnel; conducting security investigations; conducting personnel incident investigations and recommending discipline; overseeing facility management. *Major Job Description, Exhibit 21.*

70.     May spends the first 2.5-3 hours of his shift in the WEIR, loading the troops beginning their shift and downloading weapons and equipment from troops ending their shift. May "calls the line" to order the troops for uploading and downloading. *May Depo., Ex. 3, pp. 24:20-25:12.*

71.     Prior to loading troops in the WEIR, May conducts muster. *May Depo., Ex. 3, p. 26:9-23.* The Majors also conduct visual fitness-for-duty examinations and confer with shift Lieutenants and Captains to see if there are any problems in the field with personnel or any other issues. *Id., p. 53:17-23.*

72.     The majority of May's time is spent at headquarters overseeing the entire shift, including verifying patrol reports and verifying inventories of weapons, ammunition and equipment. *May Depo., Ex. 3, pp. 27:20-28:9.* The patrol reports May receives have already been reviewed by Lieutenants and contain information detailing the shift activities of the SPOs. May's job is to double check the reports for accuracy. *May Depo., Ex. 3, p. 29:6-14.*

73.     May views his role as a Major in an emergency as similar to that of a Lieutenant in that he orchestrates the Lieutenants and SPOs to respond to a threat as opposed to personally engaging the threat, maintaining a position of control. *May Depo., Ex. 3, pp. 43:17-44:17*.

74.     OTC training allows any Supervisor to take the lead in an emergency situation, position others, and step in if necessary. *May Depo., Ex. 3, pp. 46:19-47:14.*

75.     During the fitness-for-duty examination, if a Lieutenant raises a concern regarding a particular SPO's fitness for duty, the Major investigates by speaking with the Lieutenant and SPO, disarming the SPO if necessary, and reporting the incident to his manager with recommendations for action or discipline. Recently, May received a report from a SASS Lieutenant during formation that an SPO was suffering some personal problems and should be sent to occupational medicine. After investigating, May agreed and made the same recommendation to his superior, who then carried out the recommendation. *May Depo., Ex. 3, pp. 54:17-56:10*.

76.     As a Major, May is alerted to disciplinary issues by Lieutenants. Majors review PORs and additional documentation, conduct an investigation, and review the Lieutenant's recommendation for discipline. Majors have discretion to concur in the discipline recommended by the Lieutenant, or to make their own recommendation. Majors then forward the information on to upper management or the labor relations manager, who make the final call and report back to the Majors, who report the orders to the appropriate Lieutenant to carry out. *May Depo., Ex. 3, pp. 22:3-23:1.* If the Lieutenant is unavailable, May administers the discipline himself. *Id., p. 24:9-19.*

77.     Majors can use their discretion to reduce the level of discipline recommended by a Lieutenant. *May Depo., Ex. 3, pp. 23:12-24:4, 34:17-25.*

78.   In August of 2008, as a Lieutenant, May issued a LOW ("Letter of Warning") to SO Frank Padilla. May conducted an investigation, obtained a statement from Padilla, completed a POR and recommended discipline. *May Depo., Ex. 3, pp. 29:16-30:3; 8/8/08, LOW, Exhibit 22.*

79.    In September of 2009, as a Lieutenant, May investigated an incident in which a SPO was found sitting inside of a post shed instead of posted at duty in front of the shed.  *May Depo., Ex. 3, p. 33:13-21.* May investigated and asked the SPO for a statement. May completed the POR and recommended a LOR.  May's disciplinary recommendation was followed. *Id., Ex. 3, pp. 34:9-35:2; 9/8/09, Grievance Form, Exhibit 23.*

80.   In Spring 2010 May investigated an incident in which a Lieutenant was alleged to have acted unprofessionally toward a subordinate. May recommended corrective counseling as a disciplinary action, and his recommendation was followed. *May Depo., Ex. 3, pp. 31:13-32:3.*

81.   Unlike Lieutenants, Majors are not required to administer OSPAs (formerly called DSEs), but are encouraged to do so at their discretion. May gives about twenty OSPAs a month to his subordinates if he hears rumors of performance issues in the field. May can order a Lieutenant to administer OSPAs in his place. *May Depo., Ex. 3, p. 59:8-17, 59:23-60:2, 60:8-16.*

82.   May has discretion to issue Verbal Orders ("VODOs") to his subordinates to assist with or facilitate a procedure, exercise, or directive. *May Depo., Ex. 3, pp. 26:24-27:8.*

83.   May participated on a hiring panel for a Captain position in Spring 2010. May used his experience and independent judgment to score the candidates' interview answers. His input was considered equally with that of the other panelists. May's highest-ranked candidate was hired. *May Depo., Ex. 3, pp. 35:21-36:6, 37:19-38:23; Interview Schedule, Exhibit 24.*

## II.   ARGUMENT

### A.   Summary Judgment Standard

Summary judgment is appropriate if the evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  When the moving party bears the burden of proof at trial, it "must establish, as a matter of law, all essential elements of the issue before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case.  *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008) (citations omitted). In the FLSA context, "summary judgment may be appropriate where the parties agree as to the duties performed, but disagree as to whether the nature of the duties is properly characterized as managerial." *Mullins v. City of New York*, 523 F. Supp. 2d 339, 353 (S.D.N.Y. 2008), *citing Icicle Seafoods, Inc. v. Worthington, et al,* 475 U.S. 709, 714 (1986).

### B.      Plaintiffs Cannot Prevail on Their Claims as a Matter of Law

The FLSA does not require an employer to pay its employees time and one-half for hours worked over forty in a week, if those employees meet one of the FLSA's specified exemptions. The FLSA exempts individuals employed in a bona fide executive, administrative or professional capacity. 29 U.S.C. § 213(a)(1). The FLSA also permits an employee who performs a combination of exempt administrative and exempt executive duties to qualify for exempt status. 29 C.F.R. § 541.708.  While it is the employee's burden to prove that the employer is violating the FLSA, *see Christensen v. Harris County*, 529 U.S. 576, 585 (2000), it is the employer's burden to prove that an employee is exempt. *See Chessin v. Keystone Resort Mgmt., Inc.*, 184 F.3d 1188, 1192 (10th Cir. 1999).

Plaintiffs' FLSA claims fail because Plaintiffs are not first responders pursuant to 29 C.F.R. § 541.3(b) (the "first responder regulation"). Even if some of their duties are first responder duties, the Court is to analyze whether they meet any of the FLSA's exemptions.

Plaintiffs meet the job duties test of the executive, administrative or a combination of the executive and administrative exemptions and are properly classified as exempt.

### 1.      Plaintiffs Are Not "First Responders"

DOL promulgated a "first responder" regulation in 2004 to clarify their exempt/nonexempt status under the FLSA. *See 69 Fed. Reg. 22122-01, 22129-22130* (April 23, 2004) (discussing case law determining whether such employees met exemption requirements). The regulation, 29 C.F.R. § 541.3(b)(1), provides:

> The section 13(a)(1) exemptions and the regulations in this part also do not apply to police officers, . . . fire fighters, paramedics, emergency medical technicians, ambulance personnel, rescue workers, hazardous materials workers and similar employees, regardless of rank or pay level, who perform work such as preventing, controlling or extinguishing fires of any type; rescuing fire, crime or accident victims; preventing or detecting crimes; conducting investigations or inspections for violations of law; performing surveillance; pursuing, restraining and apprehending suspects; detaining or supervising suspected and convicted criminals, including those on probation or parole; interviewing witnesses; interrogating and fingerprinting suspects; preparing investigative reports; or other similar work.

29 C.F.R. §541.3(b)(1). DOL indicated first responder employees generally do not qualify as exempt "regardless of rank or pay level." *Id.* DOL reasoned as follows: (1) first responders do not qualify as exempt executive employees because their *primary duty* is not management of the enterprise, even though some may direct the work of others; and (2) first responders do not qualify as exempt administrative employees because their *primary duty* is not the performance of work directly related to the management or general business operations of the employer.[3] *See* 29 C.F.R. § 541.3(b)(2)-(3) (emphasis added). "Read another way, if an employee's primary duties are management, they may qualify as exempt even if detention and supervision of suspected and convicted criminals are a part of their job." *Crawford v. Lexington-Fayette Urban County Gov't*,

---

[3] The professional exemption is not relevant to this case.

CIV. 06-299-JBC, 2008 U.S. Dist. LEXIS 50875, *16-17 (E.D. Ky., June 25, 2008), *citing* 29 C.F.R. § 541.2 (The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations); 29 C.F.R. § 541.106 ("concurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the requirements of § 541.100 are otherwise met."). Thus, the crucial determination is the primary duty of the employee.

An employee's primary duty is "what he does that is of principal value to the employer, not the collateral tasks that he may also perform, even if they consume more than half of his time." *Bohn v. Park City Group*, 94 F.3d 1457, 1461 (10th Cir. 1996) (citation omitted). Under 29 C.F.R. § 541.700(a), "primary duty" means:

> the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider include but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

The "amount of time" is a factor to consider, however, time alone is not the sole test. *See* 29 C.F.R. § 541.700(b).

Plaintiffs admit they are supervisors. UMF ¶4. Their attempts to describe themselves as mere "guards" and their statements that they conduct routine patrols, check on containers, and things of that nature, do not alter the fact that their primary or most important duty is to manage subordinates, as explained in detail in section 3 below. *See* UMF ¶. Specifically, Plaintiffs contend that they are first responders because (1) the scope of the job means they could be called upon to serve as officers in tactical command at any time, (2) they have the same certifications

that SPOs and SOs have; (3) they are highly trained, (4) the response that is required of them, (5) they have a high clearance, including HRP, and (6) they are the first persons called when there is a security threat or emergency. UMF ¶ 12.

The explanations of these claimed first responder duties show that they are actually executive or administrative duties and that any first responder duties are not Plaintiffs' primary duty. Although Lieutenants might be the people to "actually stumble" on a situation or be the first called about it, their *primary* responsibility and function is to remain in charge whenever possible. UMF ¶¶18, 34, 48, 58. The certifications are needed to effectively supervise the people who carry out first responder duties, as well as step in if a threat is in the immediate vicinity and personal involvement cannot be avoided. UMF ¶8. The "training" referenced enables Lieutenants, Captains and Majors to serve as "Officer in Tactical Command" – the person who calls the shots in a security situation. UMF ¶¶35, 64, 74. Hourly employees do not have OTC training. *Id.* The fact that the protective force response to unique security threats is beyond what local law enforcement handle does not describe Plaintiffs' primary duties. The Lieutenants (and Captains and Majors) are trained to direct the SPOs and SOs to respond in those situations, and remain in charge whenever possible. UMF ¶¶21, 36, 73. Lastly, the high level clearance required is not a duty – primary or otherwise. *May Depo. p. 48:17-50:13.*

The undisputed evidence shows that Plaintiffs' *primary duty* is not that of a first responder. UMF ¶¶3, 4, 8-10, 16-30, 32-36, 38, 40-53, 56-64, 67-83. In emergency situations Plaintiffs' positions exist to be in charge of the hourly employees and direct the response. *See Bullard et. al. v. Babcock & Wilcox Technical Services Pantex, LLC*, No. Civ. 2-07cv-049-J, 2009 U.S. Dist. LEXIS 50906, *75-76 (N.D. Tex. 2009) (though the list of protective force field lieutenant duties "initially appears to substantially mirror the § 541.3(b)(1) list of non-exempt

duties, the majority of [their] time . . . is spent directly supervising their subordinates"). Plaintiffs' performance of any first-responder-type duties is secondary to their principal supervisory function.  Plaintiffs are not first responders and summary judgment is appropriate.

### 2.   The First Responder Regulation Does not Preclude Analysis of the FLSA Exemptions

The "first responder" regulation does not preclude analysis of whether an employee qualifies as an exempt executive or administrative employee. *See Crawford v. Lexington-Fayette Urban County Gov't*, CIV. 06-299-JBC, 2008 U.S. Dist. LEXIS 50875, *19 (E.D. Ky., June 25, 2008) (evidence that lieutenants and captains performed some first responder duties does not preclude analysis of executive or administrative exemption); *Mullins v. City of New York*, 523 F. Supp. 2d 339 (S.D.N.Y. 2007); *and see Pantex,* 2009 U.S. Dist. LEXIS 50906, *75-76 (analysis of exemptions reached despite presence of § 541.3(b)(1) non-exempt duties). DOL explained in a Wage and Hour Division Opinion Letter, FLSA 2005-40 (October 14, 2005), *available at* 2005 DOLWH LEXIS 52, that the FLSA exemptions may apply to individuals who perform "first responder" duties such as police lieutenants, police captains, and fire battalion chiefs positions "so long as the employees in these positions meet all of the requirements set out in the Regulations."  The question as to whether an employee is non-exempt under the first responder regulation or exempt under one of the § 541 exemptions turns on the employee's *primary* duty, not the presence of some first responder duties.

### 3.   Plaintiffs Are Exempt Because They Meet the Test for the Executive, Administrative or a Combination of Both Exemptions

#### a.   Plaintiffs are exempt executive employees.

Because Plaintiffs readily admit they are supervisors (UMF ¶4), it is unclear whether they actually dispute whether they satisfy the executive exemption. In order for an employer to

establish that its employee satisfies the exempt executive test, the employer must demonstrate that the employee (1) is paid on a salary basis in an amount not less than $455 per week,[4] (2) performs the primary duty of management, (3) customarily and regularly directs the work of two or more other employees, and (4) has the authority to hire or fire or his or her suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight. 29 C.F.R. §541.100(a).

### i.     *Primary duty of management*

An exempt executive employee must have a primary duty of "management of the enterprise . . . or of a customarily recognized department or subdivision thereof." 29 C.F.R. § 541.100(a)(2). A "shift" supervised by the employee can constitute a department or recognized subdivision. *See West v. Anne Arundel Country*, 137 F.3d 752, 763 (4th Cir. 1998).  Marquez, Maestas, Gregory and May are responsible for supervising the employees who report to them on a shift. UMF ¶¶3, 7, 16, 46, 57, 67, 68, 72. The FOD chain of command, in ascending order, includes SPOs and SO's at the bottom, these SPOs and SOs report to Lieutenants Marquez and Maestas (or other Lieutenants), who, in turn, report to Gregory (or other Captains), who in turn report to May (or other Majors), who are ultimately responsible to FOD Manager (Starkovich). UMF ¶¶3, 7. Plaintiffs are each responsible for a recognized department or shift and the "customarily recognized department or subdivision thereof" requirement is met.

The key issue is whether the employee's "primary duty," as opposed to other duties performed, entails the performance of exempt, management work. *See* 29 C.F.R. § 541.700. The regulations state "management" includes activities such as: training employees, directing the work of employees, maintaining records for use in supervision or control; handling employee

---

[4] Plaintiffs have indicated that salary level and salary basis are not in dispute. Therefore, only the remaining factors will be addressed.

complaints and grievances; disciplining employees; planning the work; apportioning the work among the employees; controlling the flow and distribution of materials and supplies; providing for the safety and security of the employees or the property; and monitoring or implementing legal compliance measures. 29 C.F.R. § 541.102.

The supervision of other employees is a management duty. *See* 29 C.F.R. § 541.102; *Anderson v. City of Cleveland*, 90 F. Supp. 2d 906, 913-14 (E.D. Tenn. 2000) (police lieutenants were exempt executives largely because they supervised others); *Pantex,* 2009 U.S. Dist. LEXIS 50906, *41-42 (protective force field lieutenants were exempt executives because their primary duty was supervision). The fact that an employer has specific policies and procedures, with tasks delineated in detail (such as the GSOs and post orders here), does not negate this conclusion because ensuring compliance and adherence to company policies is the "very essence of supervisory work." *Donovan v. Burger King Corp.*, 672 F.2d 221, 226 (1st Cir. 1982). "Nothing in the governing regulations or relevant case law requires that a supervisor must have unfettered discretion in the performance of his management duties in order to be deemed an 'executive.'" *Beauchamp v. Flex-N-Gate LLC*, 357 F. Supp. 2d 1010, 1016 (E.D. Mich. 2005).

In *Pantex*, the court ruled that the protective force field lieutenants, holding similar jobs to those in this case, had the primary duty of management.[5] 2009 U.S. Dist. LEXIS 50906 *41-42; *see also Murphy v. Town of Natick*, 516 F. Supp. 2d 153, 159 (D. Mass. 2007) (sergeants performed the primary duty of management). Pantex is the final assembly point and the only disassembly location for all nuclear weapons in the United States' arsenal. In *Pantex,* the field

---

[5] There were 10 classifications at issue in *Pantex*, however, only the field lieutenant position in that case is materially identical to the FOD Lieutenant in the case at hand. *Pantex*, 2009 U.S. Dist. LEXIS 50906, *3-4. Though the Administrative and Desk Lieutenant positions in *Pantex* have some similarities to Marquez' SASS Lieutenant duties, they are materially distinguishable, as explained below.

lieutenants' primary duty was to supervise their SPOs, who were charged with controlling access into and out of Pantex. *Id. *28-29.* They frequently traveled from location to location, observation post to observation post, to supervise subordinate SPOs within their assigned areas. *Id.* They inventoried weapons, were briefed on events, and checked their SPOs' equipment and mental fitness for duty each day. *Id.* They consulted higher management as needed for questions and other matters. *Id.* Although their list of duties initially "appears to substantially mirror the § 541.3(b)(1) list of non-exempt duties" their primary duty was supervision and they were exempt. *Id.* at *75-76*.

As in *Pantex*, Plaintiffs are supervisory members of the protective force.   UMF  ¶4.  The undisputed evidence is that the principal and most important duty Lieutenants Maestas and Marquez, who spends 50-60% of his time as a FOD Lieutenant, (and Gregory and May when they were Lieutenants) perform for SOC is the management and supervision of numerous subordinate SPOs and SOs. UMF ¶¶3, 4, 8-10, 16-30, 32-36, 38, 40-53, 56-64, 67-83. As Major May put it, "[T]he lieutenant's primary responsibility is to make sure that their people in the field can handle any situation that happens at any time." UMF ¶17. Once selected for promotion, each Plaintiff completed the Supervisor Basic Course, which covers many typical management issues and duties, such as equal employment, leadership, discipline, and interpretation of policies. UMF ¶9. They have the authority and responsibility to deploy the SPOs in a given situation, depending on their assessment of the situation. UMF ¶21. May confirmed that the "*purpose* of lieutenants is to make that assessment and determine whether deployment needs to take place." *Id.* (emphasis added). May explained that the "other stuff" such as making routine patrols, checking on containers, and things of that nature is "secondary." *Id.* The essential functions listed in the job descriptions (which Plaintiffs agree are materially accurate) and their testimony further confirm

25

that that the *primary duty* is management. UMF ¶¶19, 40, 60, 69, *and see* ¶¶3, 4, 8-10, 16-30, 32-36, 38, 40-53.

Lieutenant Marqeuz' SASS Lieutenant duties are also executive. Supervisory experience is required. UMF ¶38.  As SASS Lieutenant Marquez assigns shifts, posts, interprets and enforces terms of the CBA, determines which SPOs and SOs will be required to work overtime, and he approves and denies requests for leave. UMF ¶¶40-42. He is responsible for aspects of muster and conducts fitness-for-duty assessments. UMF ¶43.

As supervisors of Lieutenants whose primary duty is management, Captain Gregory and Major May logically have management as their primary duty.  Review of their job descriptions and testimony fortify that conclusion. UMF ¶¶60, 69 *and see* ¶¶3, 4, 8-10, 56-64, 67-83.

Specifically, the job of Captain differs from the job of Lieutenant because of the greater supervisory authority in the duties of a Captain. UMF ¶57. The Captain position exists to take charge of the situation; Gregory would not personally address a threat unless it was in his immediate vicinity.   UMF ¶58. Gregory monitors, inspects and supervises the work of the Lieutenants, SPOs and SOs assigned to him and is entrusted with the primary responsibility of ensuring that their work is properly performed. UMF ¶60. During threat situations, Gregory assumes a tactical command position over the Lieutenants, SPOs and SOs reporting to him and is responsible for supervising and directing them.  UMF ¶64. He can institute discipline for failure to obey orders, initiate and recommend formal discipline, and is expected to represent management if a grievance from an SPO is filed against a Lieutenant in his chain of command. UMF ¶¶61-63. Gregory assigns the shifts according to the SPOs and SOs that he has determined work best together. UMF ¶59.

Likewise, Major May's primary duty is management. May spends the majority of his

time at headquarters (an office) overseeing the entire shift. UMF ¶72. His duties include supervising Captains and Lieutenants; overseeing staffing requirements and leave requests; managing shift personnel; providing administrative oversight by reviewing and verifying reports; interpreting policies and instructing subordinates; reviewing policies and procedures and recommending changes; providing emergency management of security and safety incidents; assigning and monitoring tasks performed by subordinates; conducting and assisting with internal audits; conducting security investigations; conducting personnel incident investigations and recommending discipline; and overseeing facility management. UMF ¶¶68-70, 73, 75, 78-80.  May conducts muster and conducts fitness-for-duty examinations of personnel, including Lieutenants. UMF ¶71.  May can require a Lieutenant to administer OSPAs and conduct investigations into incidents or the performance of hourly employees. UMF ¶¶76, 81. May reviews discipline recommended by Lieutenants and has discretion to accept or reject the recommendations. UMF ¶¶76, 77.

Plaintiffs' primary duties are precisely those defined as "management" in 29 C.F.R. § 541.102. As in *Pantex*, they are exempt.

ii.      *Supervision of two or more employees*

Maestas and Marquez supervise too many SPOs to name. UMF ¶¶16, 46. As SASS Lieutenant Marquez is responsible for the schedules and staffing of all SPOs and posts on shift. UMF ¶40, 41, 46. Gregory oversees three Lieutenants and 15 SPOs in Zone 1 on the swing shift. UMF ¶¶57. May is responsible for the supervision of approximately eight supervisors in addition to 40 other personnel at a time. UMF ¶68.  Plaintiffs customarily supervise two or more other employees.

iii.      *Suggestions and recommendations are given particular*

27

*weight*

Under 29 C.F.R. § 541.105, "[t]o determine whether an employee's suggestions and recommendations are given "particular weight," factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon."

"Generally, an executive's suggestions and recommendations must pertain to employees whom the executive customarily and regularly directs. It does not include an occasional suggestion with regard to the change in status of a co-worker. An employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status." *Id*.

In *Murphy* the Court addressed the issue of authority for police lieutenants and sergeants in the Town of Natick. 516 F. Supp. 2d at 159. The Court noted that the Town "operated under the civil service system such that superior officers did not have the ultimate authority to hire or fire patrol officers." Nonetheless, the Court determined that "superior officers play an influential role in the process by evaluating and interviewing new hire candidates as well as candidates for promotion" and that they "play[ed] a significant role in disciplinary determinations."  While the Court recognized that the civil service rules constrained their authority, it likewise recognized that "virtually no superior officer would be exempt under the FLSA" if the rules were held dispositive for all decisions. Ultimately, the Court determined that "by virtue of their independence from close supervision and their powers to direct the work of their subordinates

they were "executive" employees…." *Murphy*, 516 F. Supp. 2d at 160.

Here, Lieutenants Maestas and Marquez have at least as much authority as the police supervisors in *Murphy* but are not nearly as constrained in the exercise of that authority.  UMF ¶¶17-19, 21-25, 27, 28, 34-36, 40-43, 46, 49-53. Captain Gregory and Major May have additional supervisory authority and their decisions are accorded the same or greater weight than Lieutenants Maestas' and Marquez' decisions.  UMF ¶¶57, 59-63, 67, 69-71, 75, 77, 80-82.

Plaintiffs have the capacity to suggest, recommend and implement discipline. UMF ¶¶19, 23, 24, 27, 40, 49, 76, 77. Lieutenants Maestas and Marquez are expected to investigate employee misconduct and performance issues, report their findings in a POR, and recommend discipline without direct supervision. UMF ¶¶24, 40, 43, 50-52. They administer discipline to subordinates. UMF ¶¶25, 43, 50, 51. They have discretion to determine on the spot whether a SPO's performance, such as failure to accurately perform an OSPA, should result in discipline, remedial training, or simply additional review of the procedure at the time. UMF ¶¶27, 30, 46. Captains have authority to recommend disciplinary action against Lieutenants. UMF ¶¶60. Captains also complete PORs and ROIs, and accept or reject discipline recommendations of Lieutenants, or direct Lieutenants to investigate and discipline SPOs.  UMF ¶¶62. Majors can initiate disciplinary action against Captains, Lieutenants and SPOs, and can direct Captains or Lieutenants to conduct investigations of their subordinates. UMF ¶¶69, 76, 80, 81.

Plaintiffs' recommendations are given "particular weight" in hiring and other employment decisions in the company beyond discipline and day-to-day supervision and direction. UMF ¶¶19, 22, 23, 25, 29, 41, 42, 59, 62, 69, 75. Their disciplinary recommendations are usually followed. UMF ¶¶25, 50, 51, 63, 75. For example, as a Lieutenant, May recommended disciplinary action against hourly employees after he investigated, obtained

statements from the employees, and prepared reports of the incidents. His recommendations were followed.  UMF ¶¶78, 79.  As a Major, May initiated disciplinary action for a Lieutenant for her manner of supervising her subordinates. UMF ¶80. Their hiring recommendations are given equal weight as the other panelists' in selecting candidates for hire or promotion. UMF ¶¶29, 83. Maestas' recommendation was used to change a GSO. UMF ¶25. Gregory's input regarding the design of strategies is sought and utilized. UMF ¶64.

The undisputed evidence shows that Plaintiffs' primary duty is management, they supervise more than two employees, and their decisions and recommendations are given particular weight. They are exempt executives under the FLSA.

        b.     <u>Alternatively, Plaintiffs are exempt administrative employees.</u>

Employees meet the administrative job duties exemption if: (1) their primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (2) their primary duty includes the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200(a).

        i.     *Performance of office or non-manual work directly related to the management or general business operations*

Administratively exempt employees must perform "office or non-manual work" and their work must be related to the management or general operations of the employer as their primary duty.  *See* 29 C.F.R. § 541.200(a)(2); *and see Bohn*, 94 F.3d at 1461; 29 C.F.R. 541.700(a) (primary duty).

It is not necessary that the work be done in an office. *E.g., Ferrell v. Gwinnett County Bd. of Educ.*, 481 F. Supp. 2d 1338 (N.D. Ga. 2007) (school police officers found to be

administratively exempt when primary work duties were "non-manual" even though a large portion of work was performed outside of the office). The regulations define "manual work" with a list of examples of "employees in maintenance, construction and similar occupations such as carpenters, electricians . . . laborers and other employees who perform work involving repetitive operations with their hands, physical skill and energy…." 29 C.F.R. 541.601(d). Plaintiffs' work does not involve repetitive operations with their hands, physical skill and energy.

The phrase "directly related to management policies or general business operations of [the] employer," describes the type of activities related to assisting with the running or servicing of the business, as distinguished from manufacturing or production work. 29 C.F.R. § 541.201(a) (2010). Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as safety. *Id*. at § 541.201(b) (2010).

Managing personnel on a shift is also an administratively exempt duty, directly related to business operations. Duties such as managing personnel, coordinating the work of others, scheduling the work of others, administering a collective bargaining agreement, monitoring reports of work completed by hourly employees are administrative exempt duties. *See e.g., Monroe Firefighters Ass'n. v. City of Monroe*, 600 F. Supp. 2d 790, 803-04 (W.D. La. 2009) (district chiefs, akin to lieutenants, met the administrative exemption). Plaintiffs Maestas, Marquez, Gregory and May each perform these administrative exempt duties. UMF ¶¶19, 20, 24, 25, 40, 49, 50, 51, 59, 60, 62-64, 69, 72, 76, 78-80.

 Further, Marquez' SASS duties include additional administrative office responsibilities,

which directly relate to management or general operations.[6] His primary SASS role is to be the scheduling expert. UMF ¶41. He is responsible for establishing daily schedules of personnel; identifying and assigning open posts in advance and mid-shift in accordance with leave requests, CBA terms, certification requirements and other factors; inventorying; creating bi-weekly schedules and Daily Activity Reports, as well as other reports. UMF ¶¶40-42.

### ii.    Discretion and independent judgment

To qualify for the administrative exemption, an employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance. The use of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. 29 C.F.R. § 541.202(a). Some factors pointing toward the use of judgment and discretion include: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances. *Id*. at § 541.202(b). Employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level. *Id*. at § 541.202(c).

Plaintiffs' duties, including Marquez' SASS duties, are readily distinguishable from the Administrative and Desk Lieutenants in *Pantex,* who were found to be non-exempt. *Pantex*, 2009 U.S. Dist. LEXIS 50906 *80. In *Pantex*͵ the Administrative and Desk Lieutenants answered the phones, kept track of the schedules for SPOs' training, medical and other appointments. They

---

[6] Because Marquez spends 50-60% of his time as FOD Lieutenant, the "primary duty" of his SASS Lieutenant duties does not  equate to his "primary duty" overall.

had only limited authority to authorize temporary absences for personnel in the absence of the Shift Commander and they did not have authority to schedule and approve absences. They called in workers for overtime, but had no discretion regarding who was called and had to follow a prescribed roster. The Desk Lieutenants' "most important function is to print off the daily work roster . . ." and the "second most important function is to go down the CBA-approved 'call list'" to get employees to work overtime. *Id.* at *31-32.

In contrast, Plaintiffs here have discretion to act regarding their administrative duties. As examples, they determine whether an investigation into errors on the reports they review is needed, whether training or discipline is better suited to address deviations from post orders and GSOs, and they determine which steps to take if an SPO is absent or unfit. UMF ¶¶25, 27, 30, 41, 49, 62, 78. In his SASS role, Marqeuz is the person other supervisors "go to" for guidance regarding the correct interpretation and application of the CBA as it relates to scheduling.  UMF ¶¶41-42.  There is no pre-set list of SPOs to call and Marquez himself has the discretion and responsibility to determine who is qualified and eligible for overtime pursuant to the CBA, various policies and GSOs. *Id.*  Plaintiffs' decisions are subject to grievances, which shows their decisions are affected by their independent judgment. UMF ¶¶26, 44, 61. The high level of initiative Marquez takes was commended by his superiors, as was the level of service he provides to the troops. UMF ¶47. Without discretion and judgment there would be no "level" of service to recognize.

Even in areas where the ability to exercise independent judgment and discretion is limited, such as in the execution of established safety and security procedures, an employee may still be deemed exempt. "The use of manuals, guidelines or other established procedures containing or relating to highly technical, scientific, . . .  or other similarly complex matters . . .

33

does not preclude exemption . . . ." 29 C.F.R. § 541.704; *see Renfro v. Indiana Michigan Power Co.*, 497 F.3d 573, 577 (6th Cir. 2007). In *Renfro*, employees at a nuclear power facility were subject to "rigid procedures" and their job, by its nature, was heavily regulated, however this did not eliminate the exercise of discretion and independent judgment in the performance of their primary duty. *Renfro, supra.*

As in *Renfro*¸ the fact that Plaintiffs' work is subject to GSOs, post orders, and the like does not preclude the exercise of discretion and independent judgment. The undisputed evidence shows that Plaintiffs exercise discretion and independent judgment with respect to matters of significance in the performance of their duties.

c.   <u>Alternatively, Plaintiffs meet the combination exemption</u>

Under the combination exemption, "[e]mployees who perform a combination of exempt duties as set forth in the regulations . . . for executive [and] administrative . . . employees may qualify for exemption." 29 C.F.R. § 541.708.  For example, "an employee whose primary duty involves a combination of exempt administrative and exempt executive work may qualify for exemption." *Id*.  "[W]ork that is exempt under one section of this part will not defeat the exemption under any other section." *Id*. The combination exemption provides a mechanism for cobbling together different exempt duties for purposes of meeting the primary-duty test." *IntraComm, Inc. v. Bajaj*, 492 F.3d 285, 293 (4th Cir. 2007) (citing 29 C.F.R. § 541.708).

Here, Plaintiffs' duties include executive and administrative components, as described above. Marquez' job is particularly suited to the combination exemption because it is a "hybrid" of SASS and FOD Lieutenant responsibilities, with the FOD duties comprising 50-60% of his time. UMF ¶¶45, 46. As explained in the preceding two sections, the primary duty of a FOD Lieutenant is executive, and the SASS Lieutenant duties have a heavy administrative component.

Because the nature of the functions is all exempt work, the fact that some of the duties more squarely fit within the administrative vs. executive exemption does not defeat exempt status.

In sum, there is no evidence that Plaintiffs' *primary duty* is that of a first responder.  The evidence shows that the fundamental purpose of their jobs is to be in charge and manage the employees in both day-to-day operations and during emergencies.  Their jobs satisfy one or more of the FLSA exemptions, and their claims should be dismissed.

## III   CONCLUSION

For the reasons set forth above, the undisputed evidence shows that Plaintiffs are exempt under the FLSA and summary judgment is proper for Defendants.

Respectfully submitted,

MOODY & WARNER, P.C.

By: */s/Electronically filed by W. Warner 6.10.10*
        Christopher M. Moody
        Whitney Warner
        4169 Montgomery Blvd. NE
        Albuquerque, NM 87108
        505.944.0033
and

LITTLER MENDELSON, P.C.
        Kimberly J. Gost
        1601 Cherry Street Suite 1400
        Philadelphia, PA  19102
        267.402.3007
        *Attorneys for Defendant*

We hereby certify that we have served by
electronic filing a true and correct copy of
the foregoing pleading to the following
opposing counsel of record this 10th day of
June 2010.

Hannah Best
HANNAH BEST & ASSOCIATES
Co-counsel for Plaintiffs
P.O. Box 27670
Albuquerque, NM  87125
hannahbbest@aol.com
505.247.2727

and

Darrell M. Allen
Co-counsel for Plaintiffs
505 14th Street NW
Albuquerque, NM  87104
darrell.allen@voxoptima.com
505.306.1685

By: */s/Electronically filed by W. Warner 6.10.10*