IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

MICHAEL MAESTAS, THOMAS MAY,
JUANITO MARQUEZ, and JAHMAAL GREGORY,
on behalf of themselves and all others similarly situated,

                Plaintiffs,

vs.                                            Civ. No. 09-019 JCH/LFG

DAY & ZIMMERMAN, LLC, and
SOC, LLC,

                Defendants.

## MEMORANDUM OPINION AND ORDER

       This matter comes before the Court on Defendants' *Motion for Summary Judgment*, filed June 10, 2010 (hereinafter "Def't. Mot.")  [Doc. 69].  After considering the motion, briefs, exhibits, and the law, and being otherwise fully informed, the Court finds that Defendants' motion is well taken and should be granted.[1]

## BACKGROUND

       Plaintiffs are members of the private security force employed by Defendants to provide security at Los Alamos National Laboratory ("LANL").  Plaintiffs initially filed a putative collective action under the Fair Labor Standards Act ("FLSA") contending that Defendants have misclassified them as exempt employees, and thereby unlawfully failed to compensate them at

---

[1] Contemporaneously with filing their *Motion for Summary Judgment* ("MSJ"), Defendants filed an *Opposed Motion to Extend the Exhibit Limit* [Doc. 70].  This motion seeks to extend the exhibit limit related to the MSJ from 50 pages to 111 pages.  Because Defendants could have filed a separate MSJ for each Plaintiff, and chose instead to consolidate their summary judgment motions, such an extension is reasonable and the Court grants it.  In addition, on June 7, 2010, Plaintiffs filed a *Renewed Motion for Conditional Certification of Collective Action* [Doc. 66].  The Court stayed briefing on Plaintiffs' motion pending a decision on Defendants' MSJ.  *See* Doc. 85.  Because the Court is granting Defendants' MSJ, Plaintiffs' motion [Doc. 66] is now moot.

one and a half times their regular rate of pay for overtime hours that they have been forced to work. *See* Amended Complaint, filed April 13, 2009 [Doc. 19] at 1-2. Plaintiffs allege that their job duties do not satisfy any of the FLSA's exemptions, and that, instead, their job duties make them non-exempt "first responders" as defined by 29 C.F.R. § 541.3.

The FLSA allows an employee to bring a collective action on behalf of other "similarly situated" employees. 29 U.S.C. § 216(b). Plaintiffs initially sought conditional certification of this case as a collective action. The Court denied, without prejudice, Plaintiffs' initial motion to certify a class for a collective action. *See* Doc. 38. It then denied Plaintiffs' motion for reconsideration of that decision. *See* Doc. 44. Plaintiffs filed a second motion to certify a class for a collective action, *see* Doc. 66, but the Court stayed briefing on that motion pending a decision on Defendants' motion for summary judgment. *See* Doc. 85. Thus, decision on Defendants' motion for summary judgment is based solely on the job duties of the four named Plaintiffs.

## LEGAL STANDARD

Summary judgment is appropriate when the evidentiary record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The evidence, and all reasonable inferences derived therefrom, must be viewed in the light most favorable to the non-moving party. *See Kidd v. Taos Ski Valley*, 88 F.3d 848, 851 (10th Cir. 1996). In the context of a claim brought pursuant to the FLSA, summary judgment is not appropriate if a genuine issue of fact exists regarding an employee's primary duty. *See Bohn v. Park City Group*, 94 F.3d 1457, 1464 (10th Cir. 1996). However, summary judgment may be appropriate if the parties agree as to the duties actually performed by employees, but disagree as to whether the duties are managerial in nature. *See*

2

*Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986).  In this case, the parties do not dispute the job duties of the four Plaintiffs or whether Plaintiffs actually carry out those duties. *See* Plaintiffs' Response Opposing Defendants' Motion for Summary Judgment [Doc. 75] (hereinafter "Pl. Resp.") at 2 ("there is no appreciable dispute as to what the Plaintiffs actually do at work").  In addition, Plaintiffs and Defendants both agree "that the crucial determination before the Court is the primary duty of the Plaintiffs." *Id*.  However, the parties dispute whether Plaintiffs' job duties are more properly characterized as those of "first responders," thereby entitling them to overtime pay, or as managerial or executive duties, thereby making them exempt from overtime requirements.  Because the nature of Plaintiffs' duties is a question of law, summary judgment is appropriate in this case.

## UNDISPUTED FACTS

1.      Facts Common to Each Plaintiff

LANL contracts with Defendants Day and Zimmerman LLC and SOC LLC (collectively "SOC") for security of LANL's laboratory facilities located in Los Alamos, New Mexico. Pursuant to this contract, SOC provides paramilitary security and protection of the people, facilities, and information located within the 43 square mile LANL facility.  Undisputed Issue of Material Fact (hereinafter "UMF") 1, found in Def't Mot. [Doc. 69] at 1-2.[2]  The security force is divided into two parts: the field operations department ("FOD") and the special operations department ("SOD").  Statement of Facts (hereinafter "SOF") 2, found in Pl. Resp. [Doc. 75] at

---

[2]  Unless otherwise noted, the UMFs referenced in this section are found in Def't. Mot. at 1-17.  Plaintiffs dispute only four of Defendants' UMFs and, to the extent those UMFs are used in this section, the basis for Plaintiffs' dispute is noted.

6.[3]  The FOD's responsibility is armed and unarmed security within LANL, whereas the SOD's

responsibility is to operate as a SWAT team in the event of a major attack against LANL.  *Id.*

SOC employs non-exempt, unionized, security police officers ("SPOs") and security

officers ("SOs").  SPOs and SOs are managed by a hierarchy of officers, with the same type of

command and control structure as the military.  SOF 2.  SOC employs approximately 6 Majors,

6 FOD Captains, 6 SOD Captains, 27 FOD Lieutenants, 6 CASS ("Central Alarm System

Supervisors") Lieutenants, and 6 Shift Administration and Systems Supervisor ("SASS")

Lieutenants.  Plaintiff Maestas is a FOD Lieutenant.  Plaintiff Marquez serves as both a SASS

Lieutenant and an FOD Lieutenant.  Plaintiff Gregory is a Captain.  Plaintiff May is a Major.

Majors supervise Captains, who supervise Lieutenants, who supervise SPOs and SOs.  UMF 3.

Plaintiffs admit that they are supervisors.  UMF 4.

The security force operates 24 hours a day, seven days a week, including holidays.  SOF

4.  It is scheduled to work in three eight-hour shifts.  All of the officers working in the protective

force, including Majors, Captains, and Lieutenants, work in shifts.  *Id.*  Each shift is overseen by

a Major.  UMF 7.  SOC's operations are divided into four zones.  Within each zone, there are

several posts. Each post is staffed by an SPO or SO, and each has a different function.  UMF 6.

Majors, Captains, and Lieutenants (collectively "Supervisors") must maintain all of the

certifications that SOs and SPOs have, in addition to completing further supervisory training.

UMF 8.  Supervisors maintain the same certifications as those who carry out the response duties,

such as first responder training, respirator training, and hazardous materials training.  SOF 15.

Supervisors must maintain these certifications in order to be effective supervisors of the SPOs

---

[3]  The SOFs referenced in this section are found in Pl. Resp. at 5-16.

and SOs, and so that they can act appropriately if, for some reason, a Supervisor has to take an active response role in an emergency.  *Id*.  Supervisors are also required to wear uniforms and bulletproof vests, and to carry a service weapon.  SOF 6.

Supervisory experience is a minimum qualification for a Lieutenant position.  UMF 10. Once promoted to Lieutenant, all supervisory employees must complete a Supervisor Basic Course as well as on-the-job training.   The Supervisor Basic Course lasts approximately three weeks and covers an extensive number of topics, including: Equal Employment/Affirmative Action and Sexual Harassment for Supervisors; Ethics of Management for Supervisors; Introduction to Leadership Skills; Situational Leadership II; Zone Scheduling; Post Management; CBA Pre-Discipline; CBA Grievance and Arbitration; Fitness for Duty; Supervisor Responsibilities for Employee Assistance Program; Incident Investigation and Reporting; On the Job Training; Performance Testing and Performance Assessments; Coaching Techniques; and Officer in Tactical Command.  Each Plaintiff completed this course when he was first promoted to Lieutenant.  UMF 9.

2.    Facts Pertaining to Plaintiff Lieutenant Michael Maestas

SOC hired Lieutenant Maestas as an SPO in September 2002.  Lieutenant Maestas was promoted to FOD Lieutenant in October 2004 and remains in that position as of the time of this lawsuit.  Lieutenant Maestas is currently supervised by Plaintiff Captain Jahmaal Gregory.  UMF 13.  Lieutenant Maestas is responsible for the supervision of uniformed security personnel such as SPOs and SOs, and he supervises a varying number of SPOs, depending upon the zone and shift to which he is assigned.  UMF 16.  In promoting him to FOD Lieutenant, SOC relied on Lieutenant Maestas' seventeen years of supervisory experience in the U.S. Armed Forces.  UMF 14.  Lieutenant Maestas received a 10% raise upon his promotion to FOD Lieutenant.  UMF 15.

5

An FOD Lieutenant's job duties include, among other things: inspecting personnel during formation to ensure subordinates have all equipment and identification for duty; inspecting posts and vehicles for damage; monitoring fitness for duty of assigned personnel; supervising weapons and equipment issue rooms; reviewing and verifying timesheets for subordinates as well as patrol reports; performing post checks; creating and filing incident reports; documenting and recommending disciplinary action; creating schedules; conducting daily security exercises; training new personnel on procedures, requirements and hazards; interpreting policies and instructing subordinates; and providing assistance for emergency management of security and safety incidents.  UMF 19.  A Lieutenant's primary responsibility is to ensure that the SPOs that they manage can handle any situation at any time for the protection of LANL.  SOF 51.[4]

During formation Lieutenants such as Plaintiff Measatas conduct visual "fitness for duty" examinations of the SPOs to look for signs of illness, alcohol abuse, or other distraction that would threaten an SPO's ability to perform their tasks.  Lieutenants have the authority and responsibility to remove from duty any SPO that they determine is not fit for duty.  If any Lieutenant concludes through his experience and observation that an SPO is not fit for duty, he is to notify the Major supervising his shift.  UMF 23.  In addition, during his shift, Lieutenant Maestas checks each post and verifies that each post is staffed properly.  If a post is not staffed properly, he must be prepared to step in, until it can be filled.  UMF 20.

Lieutenants also conduct On Shift Performance Assessments ("OSPAs") to verify that SPOs have memorized security procedures and are able to perform them correctly.  If an SPO

---

[4] Plaintiffs disputed this statement of fact when offered by Defendants as UMF 17, contending that a Lieutenant's primary duty is to act as the first and last line of defense.  *See* Pl. Resp. [Doc. 75] at 2.  However, several pages later, Plaintiffs adopt Defendants' characterization of a Lieutenant's primary responsibility.  *See id*. at 15, ¶ 51.

fails an exercise, a Lieutenant has the discretion to retrain them on the spot, require remedial training, remove them from duty, or recommend disciplinary action.  UMF 27.  Lieutenants must administer at least two OSPAs per day, but may conduct more in their discretion.  Lieutenant Maestas was commended for conducting 133 OSPAs on his subordinates in January 2006.  UMF 28.

Lieutenants also have the ability and responsibility to discipline SPOs.  Following an incident such as removing an SPO from duty, Lieutenants are responsible for completing a Point of Observation Report ("POR").  PORs are used to report and investigate injuries, loss of equipment, or SPO policy violations that might result in disciplinary action.  Lieutenants may recommend disciplinary action or they may determine that disciplinary action is not needed. UMF 24.  The decisions of Lieutenants may be grieved by SPOs and SOs.  Should a Lieutenant's decision be grieved by an SPO, the Lieutenant must represent management in the grievance process.  UMF 25.  As an example of discretion in the disciplinary process, in November 2008, Lieutenant Maestas completed a POR for an SPO who had been late in completing his patrol rounds.  During his investigation of the incident, Lieutenant Maestas discovered that the SPO had misinterpreted a General Security Order ("GSO") that specified the number of minutes permitted between security checks.  Based on his experience, Lieutenant Maestas concluded the GSO was confusing, raised it with his supervisors, and was successful in changing the procedure.  He used his judgment to recommend a pre-disciplinary letter for the SPO because the SPO had an exemplary record and the GSO was confusing.  UMF 25.

In addition to their other responsibilities, Lieutenants participate on hiring panels for SPO candidates.  In August of 2006, Lieutenant Maestas served on a hiring panel for six SPO candidates.  Lieutenants use their own experience and independent judgment to evaluate the

candidates and to score their answers to interview questions.  Their hiring recommendations are generally followed.  Non-supervisory employees do not serve on hiring panels.  UMF 29.

Lieutenants conduct and supervise alarm maneuvers.  When an alarm sounds, a Lieutenant is notified.  The Lieutenant exercises his discretion and independent judgment to decide the best use of manpower and equipment to respond to the call.  For example, a Lieutenant determines whether SPOs are at their correct posts and, if they are not, assesses the situation to determine what action to take.  The actions a Lieutenant may take, based on his discretion, include repositioning SPOs, filling in at a post himself, investigating the cause of the alarm, or requiring SPOs to investigate the alarm.  UMF 22.

In emergency situations, a Lieutenant's role is to assess the situation, coordinate the positions of SPOs, and act as the facilitator for the arrival of Los Alamos Police, Fire, or other emergency responders.  UMF 21, 33.  Supervisors, such as Lieutenants, are trained to serve as the Officer in Tactical Command ("OTC"), the person who gives orders in a security situation. SPOs and SOs do not have OTC training.  UMF 35.  Although a Lieutenant may be the first person to come across an emergency situation or the first person called to respond to the situation, his primary responsibility is to remain in charge whenever possible and to direct the response of the SPOs and SOs as opposed to personally engaging the threat.  UMF 18, 34.  In the event of a security threat that is beyond the capacity of local law enforcement to handle, a Lieutenant is trained to direct the SPOs and SOs to respond to the situation, and is still expected to direct the response rather than personally engaging.  UMF 36.

3.    Facts Pertaining to Plaintiff Lieutenant Juanito Marquez

SOC hired Lieutenant Marquez as an SPO II in January 2005 and promoted him to Shift Administration and Systems Supervisor ("SASS") Lieutenant in September 2006, for which he

received a 10% raise.  UMF 37, 39.  The primary duty of a SASS Lieutenant is to serve as a

"scheduling specialist."  UMF 41.  A SASS Lieutenant's essential job duties include, among

other things: inspecting personnel during formation to ensure subordinates have all equipment

and identification for duty; monitoring fitness for duty of assigned personnel; establishing daily

schedules of FOD personnel; identifying and assigning open posts for staffing; accounting for

firearms and equipment issuance; training subordinates on specific duties; interpreting policies

and instructing subordinates; creating bi-weekly schedules and Daily Activity Reports; preparing

and submitting Daily Strength and Accountability Reports, and unbudgeted overtime reports;

handling employee grievances; conducting investigations; and recommending and documenting

disciplinary actions as needed.  UMF 40.

        As a SASS Lieutenant, Plaintiff Marquez is responsible for scheduling the SPOs and

SOs, handling requests for time off, ensuring that the CBA provisions are followed and enforced

as to overtime and other assignments, quickly responding to changes in personnel availability

during a shift, and ensuring that each post is staffed with an SPO or SO who has the required

certifications for that post.  UMF 41.  For instance, when determining which SPO should fill an

open post, SASS Lieutenant Marquez must evaluate whether a particular SPO has the necessary

certifications and eligibility compared to other SPOs, pursuant to the CBA.  He personally deals

with the requests for time off and determines if the employees are eligible, and if so, who should

fill the open slot.  Although he gets some input from Captains regarding the shift scheduling, the

determinations of which SPO or SO can or should be called to fill a vacant post lies with him.

UMF 42.

        The SASS Lieutenant reviews patrol reports submitted by SPOs and SOs in the field to

make sure that the times listed for each patrol or check are consistent with the GSO-allowed time

9

for each activity.  If a patrol report is incomplete or incorrect, SASS Lieutenant Marquez has the discretion to recommend disciplinary action.  UMF 49.  He also has discretion to respond to issues arising during fitness-for-duty inspections, including reorganizing post assignments in cases of an infraction  UMF 43.  In the event of a conflict or argument between two SPOs, SASS Lieutenant Marquez must investigate the incident and recommend disciplinary action, if appropriate.  UMF 52.

Lieutenant Marquez's job is a hybrid of SASS Lieutenant and FOD Lieutenant duties, such that he is referred to as an "adjunct Lieutenant."  Lieutenant Marquez spends approximately 50% to 60% of his time in the field performing the duties of an FOD Lieutenant, and the remainder of his time in the office performing SASS Lieutenant duties.  UMF 45.  In his hybrid role Lieutenant Marquez is responsible for sharing the supervision of all field uniformed security personnel with other FOD Lieutenants.  UMF 46.  His FOD Lieutenant duties, including his duties in responding to security incidents, are the same as other FOD Lieutenants such as Lieutenant Maestas.  UMF 46.

4.   Facts Pertaining to Plaintiff Captain Jahmaal Gregory

SOC hired Captain Gregory as an SPO in 2003, promoted him to FOD Lieutenant in September 2004, and promoted him to Captain in April 2007.  UMF 54.  As a Captain, Plaintiff Gregory has greater supervisory authority than Lieutenants.  Captain Gregory is assigned to Zone 1, the highest security location at the facility, and is responsible for the supervision of all shift troops at that location.  He oversees three Lieutenants and fifteen SPOs in Zone 1.  UMF 57. Some of Captain Gregory's essential job duties include: supervising the activities and responsibilities of the FOD/SOD Lieutenants; implementing the directives of the Management office; prioritizing the daily work of assigned personnel; conducting training and procedure

10

drills; deploying and managing personnel during responses; reviewing and verifying patrol reports; interpreting policies and procedures; and recommending changes or discipline.  UMF 60.[5]

Captain Gregory serves as the Officer in Tactical Command ("OTC") for his shift.  He supervises the force-on-force exercises and procedures, and the response to any emergency or threat.  As the OTC, Captain Gregory is the lead commander in the field, ensuring that all safety and security procedures are executed astutely and correctly during a threat.  Captain Gregory and other Captains have input on the development of the exercises, security orders and procedures. UMF 64.  Captain Gregory also completes Reports of Inquiry for accidents and injuries.  He conducts investigations, takes statements and makes recommendations to upper management as to how to avoid further incidents.  In addition, Captain Gregory completes reports regarding subordinates who have engaged in misconduct and he recommends discipline.   UMF 62.  If a subordinate grieves one of Captain Gregory's decisions, Captain Gregory may be required to represent management during the grievance proceeding.  UMF 61.

A Captain's responsibility is to take charge of any situation.  In the event of an emergency or security incident, a Captain first receives the report by radio from the SPO at the location of the incident.  The Captain goes to a remote location to orchestrate the response of the field troops.  UMF 58.  In his position as a manager, Captain Gregory would not be involved in personally addressing a threat unless it was in his immediate vicinity.  In emergencies, Captain

---

[5] Plaintiffs dispute this statement of fact "to the extent it attempts to define Plaintiff Gregory's primary duty within the meaning of" the FLSA's regulations.  Pl. Resp. [Doc. 75] at 3.  Plaintiffs do not contend that the job description is inaccurate or that Captain Gregory does not perform the listed duties.  Plaintiffs instead contend that these duties are not his "primary duty," and that his "primary duty is to act as the first and last line of defense of the para-military protective force that protects and safeguards [LANL].  *Id.*

Gregory's presence is mandatory in order to ensure that the troops properly execute their tasks. *Id.*

     5.    <u>Facts Pertaining to Plaintiff Major Thomas May</u>

SOC hired Major May as an SPO in August 2006, promoted him to FOD Lieutenant in September 2006, and promoted him to Major in October 2009. UMF 65. As a Major, Plaintiff May is the highest-ranking person in the field during a shift, and oversees approximately eight supervisors in addition to forty other personnel. UMF 67, 68. Some of Captain May's essential job duties include: supervising FOD/SOD Captains and Lieutenants; overseeing staffing requirements and leave requests; facilitating meetings with Captains and Lieutenants; managing shift personnel; providing administrative oversight by reviewing and verifying reports; interpreting policies and instructing subordinates; reviewing policies and procedures and recommending changes as needed; providing emergency management of security and safety incidents; assigning and monitoring tasks performed by subordinates; conducting and assisting with internal audits; reviewing and verifying timesheets and wellness tracking for all FOD/SOD personnel; conducting security investigations; conducting personnel incident investigations and recommending discipline; and overseeing facility management. UMF 69.[6]

The majority of Major May's time is spent at headquarters overseeing the entire shift, including verifying patrol reports and verifying inventories of weapons, ammunition and equipment. The patrol reports that Major May receives have already been reviewed by

---

[6] Plaintiffs also dispute this statement of fact "to the extent it attempts to define Plaintiff May's primary duty within the meaning of" the FLSA's regulations. Pl. Resp. [Doc. 75] at 3. Plaintiffs again do not contend that the job description is inaccurate or that Major May does not perform the listed duties. They instead contend that these duties are not his "primary duty,"and that his "primary duty" protect LANL. *Id.*

Lieutenants and contain information detailing the shift activities of the SPOs.  UMF 72.  Major

May views his role in an emergency as similar to that of a Lieutenant in that he orchestrates the

Lieutenants and SPOs to respond to a threat as opposed to personally engaging the threat,

thereby maintaining a position of control.  UMF 73.

Major May spends the first 2.5-3 hours of his shift in the Weapons and Equipment Room

("WEIR"), loading the troops beginning their shift and downloading weapons and equipment

from troops ending their shift.  UMF 70.  Prior to loading troops in the WEIR, Major May

conducts muster.  He also conducts visual fitness-for-duty examinations and confers with shift

Lieutenants and Captains to see if there are any problems in the field with personnel or any other

issues.  UMF 71.  During the fitness-for-duty examination, if a Lieutenant raises a concern

regarding a particular SPO's fitness for duty, the Major investigates by speaking with the

Lieutenant and SPO, disarming the SPO if necessary, and reporting the incident to the SPO's

manager with recommendations for action or discipline.  UMF 75.  Major May is also alerted to

any other disciplinary issues by Lieutenants.  Majors review incident reports and additional

documentation, conduct an investigation, and review the Lieutenant's recommendations

regarding  discipline.  Majors have discretion to concur in the discipline recommended by the

Lieutenant, or to make their own recommendation.  UMF 76, 77.  Majors then forward the

information on to upper management or the labor relations manager, who make the final call and

report back to the Majors, who report the orders to the appropriate Lieutenant to carry out.  UMF

76.  If the relevant Lieutenant is unavailable, Major May administers the discipline himself.  *Id.*

## ANALYSIS

The FLSA, 29 U.S.C. §§ 213 *et seq*., requires covered employers to pay their nonexempt

employees overtime pay of time and one half their regular rate of pay for hours worked in excess

of forty in a work week.  The FLSA exempts individuals employed "in a bona fide executive, administrative, or professional capacity."  29 U.S.C. § 213(a)(1).[7]  The FLSA also exempts employees who perform a combination of exempt administrative and exempt executive duties.  29 C.F.R. § 541.708.  Exemptions from the FLSA's overtime rules are to be "narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit."  *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960).  An employer bears the burden of proving that an employee is exempt.  *See Chessin v. Keystone Resort Mgmt., Inc.*, 184 F.3d 1188, 1192 (10th Cir. 1999).

     1.    <u>The Executive Exemption</u>

In order to establish that an employee satisfies the exempt executive test, an employer must demonstrate that the employee: (1) is paid on a salary basis in an amount not less than $455 per week[8]; (2) has, as his primary duty, the management of the enterprise in which he is employed or of a customarily recognized department or subdivision; (3) customarily and regularly directs the work of two or more other employees; and (4) has the authority to hire or fire other employees or his suggestions and recommendations as to hiring, firing, promotion, or other change of status of other employees are given particular weight.  29 C.F.R. § 541.100(a).

An employee's "primary duty" is the "principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700(a).  In evaluating what an employee's primary

---

[7] The exemption for individuals employed in a professional capacity is not at issue in this case.  In addition, because the Court determines that Plaintiffs satisfy the executive exemption, it need not address the administrative exemption.

[8] The parties have indicated that Plaintiffs' salary level is sufficient in this case.

duty is, the Court must base its determination on all of the facts in the case, "with the major emphasis on the character of the employee's job as a whole." *Id*. The Court should consider, among other factors, "the relative importance of the exempt duties as compared with other types of duties, the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id*. Although the amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee, such that an employee who spends more than 50 percent of his time performing exempt work will generally satisfy the primary duty test, time alone is not the sole test and "nothing in [the regulations] requires that exempt employees spend more than 50 percent of their time performing exempt work." 29 C.F.R. § 541.700(b). Those employees who spend less than 50 percent of their time performing exempt work may still meet the primary duty requirement if other factors support such a conclusion. *Id*.

In order to qualify under the executive exemption, an employee must have as his primary duty the "management of the enterprise...or of a customarily recognized department or subdivision thereof." 29 C.F.R. § 541.100(a)(2). A "shift" supervised by an employee can constitute a department or subdivision of an enterprise. *See West v. Anne Arundel County*, 137 F.3d 752, 763 (4th Cir. 1998). The activity of "management" includes such activities as: training employees, directing the work of employees, maintaining records for use in supervision or control, handling employee complaints and grievances, disciplining employees, planning work, apportioning work among employees, controlling the flow and distribution of materials and supplies, providing for the safety and security of employees or the property, and monitoring or implementing legal compliance measures. *See* 29 C.F.R. § 541.102.

15

2.      The "First Responder" Regulation[9]

Effective April 23, 2004, the FLSA regulations set forth a provision applicable to certain "police officers, detectives, deputy sheriffs, state troopers, highway patrol officers, investigators, inspectors, correctional officers, parole or probation officers, park rangers, fire fighters, paramedics, emergency medical technicians, ambulance personnel, rescue workers, hazardous materials workers and similar employees."  29 C.F.R. § 541.3(b)(1).  These employees are not subject to executive or administrative exemptions, regardless of rank or pay level, if they do work "such as preventing, controlling, or extinguishing fires of any type; rescuing fire, crime, or accident victims; preventing or detecting crimes; conducting investigations or inspections for violations of law; performing surveillance; pursuing, restraining and apprehending suspects; detaining or supervising suspected and convicted criminals...; interviewing witnesses; interrogating and fingerprinting suspects; preparing investigative reports; or other similar work." *Id.*  Employees who perform such work are not considered exempt executives, because their "primary duty is not management of the enterprise...or a customarily recognized department or subdivision thereof."  *Id.* at § 541.3(b)(2).  Similarly, they are not considered exempt administrative employees because their "primary duty is not the performance of work directly related to the management or general business operations of the employer or the employer's customers."  *Id.* at § 541.3(b)(3).

At issue in this case is the intersection of the first responder regulation with the FLSA's executive and administrative exemptions.  Defendants contend that, as long as Plaintiffs meet the

---

[9] Although the regulation at issue does not actually employ the term "first responder," the regulation is commonly referred to as the "first responder" regulation in case law and literature discussing the FLSA.  The Court therefore adopts that nomenclature as well.

executive or administrative exemption, the fact that they might also perform certain first responder duties does not prevent them from being exempt.  *See* Def't. Memo. at 18-19. Plaintiffs argue that such "a mechanistic application of the technical elements" would essentially render the first responder regulation moot.  Pl. Resp. at 18.  However, the first responder regulation does not preclude an analysis of whether an employee qualifies as an exempt executive or administrative employee.  As explained by the Department of Labor in a Wage and Hour Division Opinion Letter, FLSA 2005-40 (Oct. 14, 2005),[10] the executive or administrative exemptions may apply to individuals who perform first responder duties such as police lieutenants, police captains, and fire battalion chiefs "so long as the employees in these positions meet all of the requirements set out in the Regulations."  In other words, the Court must analyze whether the primary duty of each Plaintiff, defined as the "principal, main, major or most important duty that the employee performs," 29 C.F.R. § 541.700(a), is more in the nature of a first responder or that of a manager.  Because the Court concludes that Plaintiffs' primary duties are more management-related than first responder-related, it holds that Defendants have properly classified Plaintiffs as exempt employees.

    3.    Manner in which Plaintiffs are Exempt Executive Employees

        In order to establish that an employee is an exempt executive, an employer must first demonstrate that the employee performs the primary duty of "management of the enterprise or of a customarily recognized department or subdivision thereof."  29 C.F.R. § 541.100(a)(2). Defendants have demonstrated that Plaintiffs are responsible for supervising the employees who report to them on a given shift.  The question is whether Plaintiffs' "primary duty" is

---

[10] Available at 2005 DOLWH LEXIS 52.

17

management work as opposed to the performance of other duties.  As previously discussed, the

FLSA regulations state that "management" includes activities such as training employees,

directing the work of employees, handling employee complaints, disciplining employees, and

apportioning work among employees.  29 C.F.R. § 541.102.  Looking at the job descriptions for

each of Plaintiffs' positions reveals that these management activities comprise the majority of

their tasks.  Plaintiffs determine their subordinates' fitness for duty and manage responses to

security incidents.  Plaintiffs acknowledge that a Lieutenant's "primary responsibility is to make

sure that their SPOs can handle any situation at any time."  SOF 51.  Plaintiffs have the authority

and responsibility to deploy SPOs in a given situation, depending on their assessment.  Major

May confirmed that the "purpose of Lieutenants is to make that assessment and determine

whether deployment needs to take place."  UMF 21.  He explained that the "other stuff" that

managers have to do, such as making routine patrols, checking on containers, and other duties of

that nature is "secondary."  *Id.*

        The issues in this case are very similar to those found in *Bullard v. Babcock & Wilson

Technical Services Pantex, LLC*, No. Civ. 2-07-049-J, 2009 U.S. Dist. LEXIS 50906 (N.D. Tex.

June 17, 2009) ("*Pantex*").  *Pantex* involved a claim that certain security workers at the final

assembly point and disassembly location for all nuclear weapons in the United States' arsenal

were exempt employees.  One of the classifications at issue in *Pantex* was that of field

lieutenant, which is materially identical to the position of FOD Lieutenant it issue in this case.

In *Pantex*, the field lieutenants' primary duty was to supervise their SPOs, who were charged

with controlling access into and out of the Pantex facility.  *See* 2009 U.S. Dist. LEXIS 50906 at

*28-29.  The lieutenants frequently traveled among observation posts to supervise SPOs within

their assigned areas.  *Id.*  They inventoried weapons and checked SPOs' equipment and fitness

18

for duty. *Id*. They consulted higher management as needed to resolve questions. *Id*. Taking all of their duties into account, the *Pantex* court found that the lieutenants' primary duty was more supervisory than first-responder, and that they were therefore exempt employees. *Id*. at *75-76.

As supervisors of Lieutenants whose primary duty is management, Captain Gregory and Major May clearly have management as their primary duty as well. The job of a Captain differs from that of a Lieutenant because he has greater supervisory authority. UMF 57. Captain Gregory monitors, inspects, and supervises the work of the Lieutenants, SPOs, and SOs who report to him, and he is entrusted with the responsibility of ensuring that their work is properly performed. UMF 60. He can institute discipline and can reduce the recommendation of discipline made by a Lieutenant. In a threat situation, Captain Gregory would not personally address the threat unless it was in his immediate vicinity. UMF 58. Instead, he assumes a tactical command position over all of his subordinates and is responsible for supervising and directing their response actions. UMF 64. Captain Gregory has input into the development of exercises, security orders, and procedures. *Id*. Similarly, Major May's primary duty is to manage the entire shift under his supervision.

In order to be exempt executive employees, Plaintiffs must also supervise two or more employees. 29 C.F.R. § 541.100(a). Lieutenants Maestas and Marquez both supervise numerous SPOs and SOs. Captain Gregory and Major May supervise even more employees, as they supervise Lieutenants in addition to SPOs and SOs. Plaintiffs all clearly meet this requirement.

The final requirement that the employer must demonstrate in order to show that an employee is exempt is that the employee either has the authority to hire and fire or that his suggestions and recommendation as to the hiring, firing, advancement, promotion, or any other

change of status of other employees are given particular weight.  29 C.F.R. § 541.100(a).  Under 29 C.F.R. § 541.105, "[t]o determine whether an employee's suggestions and recommendations are given 'particular weight,' factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon."

In general, "an executive's suggestions and recommendations must pertain to employees whom the executive customarily and regularly directs. It does not include an occasional suggestion with regard to the change in status of a co-worker. An employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status." *Id.*

Each Plaintiff has the ability to initiate, recommend, and implement discipline. Lieutenants Maestas and Marquez are expected to investigate employee misconduct and performance issues, report their findings formally, and recommend discipline.  UMF 24, 43, 50-52.  Lieutenants have the discretion to determine whether a performance failure should result in discipline, remedial training, or an additional review of the procedure.  UMF 27.  Captains have even greater authority, in that they can accept or reject discipline recommendations of Lieutenants, can direct Lieutenants to investigate and discipline SPOs, and can recommend disciplinary action against Lieutenants.  UMF 60, 62.  Majors have greater authority still, with the ability to initiate disciplinary proceedings against any subordinate.  UMF 76-81.  Plaintiffs' recommendations are given particular weight in hiring and other employment decisions in addition to disciplinary contexts.  UMF 29, 83.  Because they meet each of the requirements

20

under the regulations, Plaintiffs are all exempt executives for purposes of the FLSA.

Plaintiffs offer a number of reasons that they believe they should be classified as first responders rather than exempt executives.  Plaintiffs contend that they are first responders because the scope of their job means that they must be ready to perform first responder duties at any time.  *See* Pl. Resp. at 20-21.  Plaintiffs argue that they have the same safety and law enforcement certifications as SPOs and SOs, that they are the first persons called when there is a security situation on the property, and that they have to wear uniforms and carry weapons.  Essentially, Plaintiff's contention is that their primary duty is to act as the first and last line of defense for LANL and to remain in full readiness to respond to any situation that may pose a threat to LANL.  *Id*. at 18.  It is this state of readiness, Plaintiffs maintain, that is of principal value to Defendants.  *Id.*

However, this argument appears to go more to the "mission" of the protective force and the reason for employing a protective force in general than it does to what the "primary duty" of the individual Plaintiffs is.  *See, e.g., Pantex*, 2009 U.S. Dist. LEXIS 50906 at *4 (field Lieutenants were exempt executive employees even though "the primary and most important mission and duty of the Pantex Protective Forces is to deny access to nuclear materials stored at Pantex").  Here, as in *Pantex*, the mission of the protective force does not determine the primary duties of individual employees.  Although Plaintiffs might have to respond to an emergency situation if it were in their immediate vicinity, their primary purpose is to manage the response.  Lieutenants assess the situation, coordinate the positions of SPOs, and act as the facilitator for the arrival of Los Alamos Police, Fire, or other emergency responders.  UMF 21, 33.  Captain Gregory first receives a report of a security situation by radio from the SPO at the location of the incident, and then goes to a remote location to orchestrate the response of the field troops.  UMF

58.  Major May similarly views his role in an emergency as that of orchestrating a response and managing others rather than personally engaging the threat.  UMF 73.  The fact that Plaintiffs maintain the first responder training that they were required to complete when they were SPOs does not render them first responders; it merely enables them to more effectively manage their subordinates and to temporarily fill the role of an SPO if the SPO is injured or unfit.  The argument that all field operatives are required to respond to an emergency, thereby rendering everyone a first responder is also misleading.  Supervisors on duty at the time of a security threat do not abandon their posts and all run to personally engage the threat.  They coordinate the response, and some of the supervisors go to the scene to ensure that the response is being handled appropriately.  Plaintiffs are the ones in charge of ensuring an orderly response to any threat, and in charge of preparing their subordinates to face any threat that emerges.  They are employed for the purpose of "ensur[ing] that the protective force as a whole is ready and able to do its job."  SOF 51.  That is a management role, and Plaintiffs are exempt executive employees.

## CONCLUSION

IT IS THEREFORE ORDERED that Defendants' *Motion for Summary Judgment* [Doc. 69] is GRANTED.


UNITED STATES DISTRICT JUDGE

22