IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

MICHAEL MAESTAS, JUANITO MARQUEZ,
and JAHMAAL GREGORY, on behalf of themselves
and all others similarly situated,

        Plaintiffs,

       vs.                                Civ. No. 09-019 JCH/LFG

DAY & ZIMMERMAN, LLC, and SOC, LLC,

        Defendants.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on *Defendants' Second Motion for Summary Judgment on Plaintiffs' Claims*. [Doc. No. 135, filed July 23, 2012]  Defendants argue that Plaintiffs are not entitled to overtime because Plaintiffs meet the executive, administrative, or combination exemptions under the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201-219 (FLSA). Plaintiffs filed a Response [Doc. No. 137, filed August 24, 2012], and Defendants filed a Reply [Doc. No. 139, filed September 21, 2012].  The Court has reviewed the parties' filings and the relevant law.

The Court concludes that Defendants have demonstrated that Captain Gregory meets the requirements of an executive employee and is thus exempt from the overtime protections of the FLSA.  The Court grants Defendants' motion for summary judgment against Gregory.

The Court concludes that Defendants have failed to carry their "heavy burden" of producing evidence that "plainly and unmistakably" shows that Lieutenant Maestas and Lieutenant Marquez meet the requirements of the executive and combination exemptions,

respectively.  *See Maestas v. Day & Zimmerman, LLC*, 664 F.3d 822, 829 (10th Cir. 2012).  The Court therefore denies Defendants' motion for summary judgment against Maestas and Marquez.

## BACKGROUND

Plaintiffs are current or previous officers in a private security force employed by Defendants to provide security at Los Alamos National Laboratory (LANL).  The force has a hierarchical, military-style structure, with "security officers" (SOs) and "security police officers" (SPOs) at the lowest level.  SOs and SPOs are unionized and non-exempt employees who are supervised by three ranks of field supervisors. Maestas is a Lieutenant, Marquez was a Lieutenant until December 2010, Gregory was a Captain until September 2010, and May was a Major.  Plaintiffs initially filed a putative collective action under the FLSA, claiming that Defendants had misclassified them as exempt employees and had unlawfully denied them overtime compensation at one and one-half times their regular rates.  [Doc. No. 19 (Amended Complaint)]  Defendants filed a motion for summary judgment [Doc. No. 69], arguing that Plaintiffs are exempt from FLSA overtime protection as "executive" or "administrative" or "combination" employees under 29 U.S.C. § 213(a)(1); Defendants argue that Plaintiffs are not non-exempt "first responders" under 29 C.F.R. § 541.3(b).

The FLSA allows an employee to bring a collective action on behalf of other "similarly situated" employees.  29 U.S.C. § 216(b).  Plaintiffs filed a motion for conditional certification as a collective action, which the Court denied without prejudice.  [Doc. No. 34, filed June 12, 2009; Doc. No. 38, filed Nov. 13, 2009; Doc. No. 44, filed Jan. 4, 2010 (denying motion for reconsideration)]  Plaintiffs filed a renewed motion for conditional certification.  [Doc. No. 66, filed June 7, 2010]  The Court stayed briefing on that motion pending decision on Defendants' first motion for summary judgment.  [Doc. No. 85]

On November 30, 2010, the Court granted Defendants' first motion for summary judgment against all four Plaintiffs. [Doc. No. 91] Plaintiffs appealed. The Tenth Circuit affirmed the grant of summary judgment against Plaintiff May, but reversed summary judgment against the other three Plaintiffs. *Maestas v. Day & Zimmerman, LLC*, 664 F.3d 822 (10th Cir. 2012).

After remand, the parties completed briefing on Plaintiffs' renewed motion for conditional certification. [Doc. No. 66, filed June 7, 2010; Doc. No. 115, filed March 12, 2012; Doc. No. 116, filed March 27, 2012] Defendants filed a *Second Motion for Summary Judgment on Plaintiffs' Claims* on July 23, 2012. [Doc. No. 135; Doc. No. 135-1]

## LEGAL STANDARDS

Defendants are entitled to summary judgment against the remaining three Plaintiffs (Maestas, Marquez, and Gregory) if Defendants show that "there is no genuine dispute as to any material fact" and they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the evidence and make inferences in the light most favorable to the non-movants, Plaintiffs. *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010). "[I]f an inference can be deduced from the facts whereby the non-movant might recover, summary judgment is inappropriate." *Brown v. Parker-Hannifin Corp.*, 746 F.2d 1407, 1411 (10th Cir. 1984). If different ultimate inferences may be drawn, "the case is not one for summary judgment," even if the court believes that the movant is more likely to prevail at trial; in ruling on a summary judgment motion, the court does not weigh the evidence, assess its probative value, or decide factual issues. *Id.* at 1411-12.

The party moving for summary judgment bears the initial burden of proving that there is no genuine dispute on a material fact. *Nahno-Lopez*, 625 F.3d at 1283. The opposing party

cannot rely on the allegations in the complaint, but must show that there is a genuine issue for trial by citing facts supported by competent evidence. *Id.*; Fed. R. Civ. P. 56(c)(1). "Conclusory legal statements" by the opposing party are insufficient in response to a motion for summary judgment. *Nahno-Lopez*, 625 F.3d at 1284.

In determining whether the non-movant has raised a genuine dispute on a material fact, the court takes into account the substantive burden of proof at trial. *Nahno-Lopez*, 625 F.3d at 1283. The non-movant "must produce sufficient evidence for a reasonable trier of fact to find in its favor at trial." *Id.* "[A]ny gaps in the evidence work in plaintiffs' favor." *Maestas*, 664 F.3d at 829.

It would be Defendants' burden at trial to prove that Plaintiffs fall "'plainly and unmistakably' within a FLSA exemption." *Maestas*, 664 F.3d at 829 (quoting *Rodriguez v. Whiting Farms, Inc.*, 360 F.3d 1180, 1184 (10th Cir. 2004)). The Tenth Circuit described Defendants' burden to show they are entitled to summary judgment because Plaintiffs are exempt as "heavy." *Id.* "[E]xemptions under the FLSA 'are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit.'" *Rodriguez*, 360 F.3d at 1184 (quoting *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960)); *see Reich v. New York*, 3 F.3d 581, 586-87 (2d Cir. 1993) (consistent with remedial purpose of FLSA, "we do not give FLSA exemptions generous application"). Congress passed the FLSA to protect workers from substandard wages and oppressive working hours. *Hein v. PNC Fin. Servs. Group, Inc.*, 511 F. Supp. 2d 563, 569 (E.D. Pa. 2007). The FLSA is intended primarily to benefit low-wage workers rather than managers or administrators; managers or administrators are less susceptible to employer abuse. *Id.*

Employees are exempt from FLSA overtime protection if they are "employed in a bona fide executive, administrative, or professional capacity." 29 US.C. § 213(a).

To establish that an employee is exempt as an "executive employee," the employer must demonstrate that: (1) the employee is compensated on a salary basis at a rate of not less than $455 per week; (2) the employee's "primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof"; (3) the employee "customarily and regularly directs the work of two or more other employees"; and (4) the employee has authority to hire or fire other employees, or the employee's suggestions and recommendations on "hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a).

The regulations define activities which constitute "management":

> Generally, "management" includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.

To establish that an employee is exempt as an "administrative employee," the employer must demonstrate that: (1) the employee is compensated on a salary basis at a rate of not less than $455 per week; (2) the employee's "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer

or the employer's customers"; (3) the employee's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200(a).

The primary duty of an "administrative employee" must be to "perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."  29 C.F.R. § 541.201(a).  Such work includes, but is not limited to:

> work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations; government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities.  Some of these activities may be performed by employees who also would qualify for another exemption.

29 C.F.R. § 541.201(b).

An employee may also be exempt if the employee performs a combination of exempt duties—for instance, if the employee's "primary duty involves a combination of exempt administrative and exempt executive work."  29 C.F.R. § 541.708.

The FLSA exemptions for an executive, administrative, or combination employee, however, do not apply to "first responders."  Those who qualify as "first responders" are employees whose primary duty is related to emergency response or law enforcement, as set forth in 29 C.F.R. § 541.3(b)(1):

> (b)(1)  The section 13(a)(1) exemptions and the regulations in this part also do not apply to police officers, detectives, deputy sheriffs, state troopers, highway patrol officers, investigators, inspectors, correctional officers, parole or probation officers, park rangers, fire fighters, paramedics, emergency medical technicians, ambulance personnel, rescue workers, hazardous materials workers and similar employees, <u>regardless of rank or pay level</u>, who perform work such as preventing, controlling or extinguishing fires of any type; rescuing fire, crime or accident victims; preventing or detecting crimes; conducting investigations or inspections

> for violations of law; performing surveillance; pursuing, restraining and apprehending suspects; detaining or supervising suspected and convicted criminals, including those on probation or parole; interviewing witnesses; interrogating and fingerprinting suspects; preparing investigative reports; or other similar work.

(Emphasis added.)  Such employees are not exempt executive employees "because their primary duty is not management of the enterprise in which the employee is employed."  29 C.F.R. § 541.3(b)(2).  "Thus, for example, a police officer or fire fighter whose primary duty is to investigate crimes or fight fires is not exempt under section 13(a)(1) of the Act merely because the police officer or fire fighter also directs the work of other employees in the conduct of an investigation or fighting a fire."  *Id.*  Similarly, "first responders" are not exempt administrative employees "because their primary duty is not the performance of work directly related to the management or general business operations of the employer or the employer's customers as required under § 541.200."  29 C.F.R. § 541.3(b)(3).

The "first responder" regulation does not alter the "primary duty" test.  *Maestas*, 664 F.3d at 827.  "Thus high-level employees who perform some first responder duties, like police lieutenants or fire chiefs, can nonetheless be exempt executives if their primary duty is managerial and they meet the other elements of the test."  *Id.*

## DISCUSSION

In *Maestas*, the Tenth Circuit stated that Defendants had not provided sufficient evidence on all of the factors relevant to a determination of the "primary duty" of Plaintiffs Maestas, Marquez, and Gregory.  *Maestas*, 664 F.3d at 830-31.  Defendants' second motion for summary judgment asserts that any "factual uncertainties" have now been resolved and "summary judgment is proper."  [Doc. No. 135-1, p. 21]  Defendants argue that Gregory and Maestas are

exempt executive employees, and that Marquez is exempt under the administrative or combination exemption.

Plaintiffs maintain that summary judgment should be denied, because a genuine dispute remains "over both how the [Plaintiffs] spent their time at work and over whether their particular activities exclude them from the overtime benefits of the FLSA." [Doc. No. 137, p. 3]  Plaintiffs dispute a number of the facts represented as "undisputed material facts" (UMFs) by Defendants. [Doc. No. 137, pp. 3-8]  Plaintiffs argue that there is a genuine dispute on whether their primary duty is as "first responders," because Plaintiffs perform the same front-line duties on a daily basis as the SPOs and SOs they supervise.  [Doc. No. 137, p. 10]  Plaintiffs argue that front-line law enforcement is their primary duty, as demonstrated by:  (1) the requirement that they wear uniforms and carry weapons, just like the SOs and SPOs they supervise; and (2) the fact that it is their duty to drop whatever they are doing to respond immediately to any alarms.  [Doc. No. 137, pp. 12-13]

An employee's "primary duty" means "the principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700(a).  The question of which duty is the employee's primary duty is a question of fact.  *Maestas*, 664 F.3d at 827-28.  The ultimate conclusion of whether a plaintiff is an exempt employee under FLSA is a legal question, reviewed de novo.  *Department of Labor v. City of Sapulpa*, 30 F.3d 1285, 1287 (10th Cir. 1994); *see Maestas*, 664 F.3d at 827 (quoting *Foxworthy v. Hiland Dairy Co.*, 997 F.2d 670, 672 (10th Cir. 1993) ("'In determining whether an employee falls within an exemption to FLSA, the district court must first make findings as to certain factors, and then apply a legal standard.'")); *Gagnon v. Resource Tech., Inc.*, 19 Fed. Appx. 745, 747, 2001 WL 909028 (10th Cir. 2001) (unpublished) ("The determination of whether plaintiff's work activities brought her within an

exception to the FLSA's overtime pay requirements is a question of law, which we review de novo.").

"Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a). Some of the factors to consider are: "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.* The amount of time spent performing exempt work "can be a useful guide in determining whether exempt work is the primary duty of an employee." 29 C.F.R. § 541.700(b). Employees who spend more than 50% of their time performing exempt work "generally satisfy the primary duty requirement." *Id.* But time alone is not the sole test; employees who spend less than 50% of their time performing exempt duties "may nonetheless meet the primary duty requirement if the other factors support such a conclusion." *Id.*

Applying these factors in *Maestas*, the Tenth Circuit held that summary judgment was properly granted against Major May because "it is clear that his managerial duties are primary." *Maestas* 664 F.3d at 831. There was undisputed evidence about how Major May spent his days: leading the daily briefing of all captains, lieutenants, and subordinate officers; spending about three hours distributing and collecting weapons from subordinates; and spending the majority of his remaining shift in headquarters, supervising the entire shift. *Id.* The Tenth Circuit determined that these are all management duties. The Tenth Circuit observed that, as the highest ranking official in the field, Major May had a greater degree of independence and discretion than the subordinate officers. Even though there was no evidence on the fourth factor—May's salary

as compared to that of his subordinates—the Tenth Circuit concluded that May's primary duty was management and he was not a first responder. *Id.* The Tenth Circuit thus concluded that "all reasonable factfinders" would conclude that the managerial portions of May's job were his primary duty. *Id.* at 829 (standard for granting summary judgment on factual issue).

**Captain Gregory**

Plaintiff Gregory was hired as an SPO in 2003 and promoted to "Field Operations Division" (FOD) Lieutenant in September 2004. He was promoted to FOD Captain (previously called "First Lieutenant") in April 2007, and ended his employment in September 2010. [UMF #74]

In *Maestas*, the Tenth Circuit observed that Captain Gregory was "responsible for supervising the daily work of his subordinates, implementing policies handed down by upper management, reporting on personnel incidents in the field, and recommending discipline or changes in SOC policies." *Maestas*, 664 F.3d at 826. The Tenth Circuit stated that Gregory performed "bona fide managerial duties" in "ensuring the operational readiness of his subordinates by performing checks and administering readiness tests." 664 F.3d at 831. Based on the record at that time, the Tenth Circuit stated that Gregory "also directs the response of his subordinates working alongside them in the field—a first responder duty." *Id.* (emphasis added). The Tenth Circuit observed that "although 'directing the work of employees' is normally a managerial duty, it is not a managerial duty when it is performed concurrently with front-line law enforcement work." *Maestas*, 664 F.3d at 829 (emphasis added).

The Tenth Circuit observed that Defendants had not presented evidence on how Gregory divided his time between these duties. *Id.* at 831. And the Tenth Circuit stated that a

consideration of the other "primary duty" factors was inconclusive, observing that Gregory

"certainly enjoy[ed] more freedom from direct supervision" as the lead commander in the zone,

but the extent of this freedom was not clear. *Id.* And there was at that time no information in the

record on Gregory's salary relative to his subordinates. *Id.* The Tenth Circuit held that the

record was insufficient to determine Gregory's primary duty and reversed the grant of summary

judgment. *Id.*

On remand, Defendants have presented a great deal of additional and detailed

information on Gregory's duties and the amount of time devoted to each task. Gregory's duties

included:

(1) supervising the activities, responsibilities, projects and tasks of all shift troops in Zone 1, including 3 lieutenants and 15 SPOs [UMF #78, #82];

(2) overseeing staffing and ensuring that every post was staffed at all times; this took 50% of Gregory's shift [UMF #83];

(3) 30 to 60 minutes, spread out throughout his shift, conducting shift briefings [UMF #84];

(4) providing daily operational support to the Field/Special Operations Managers, participating and assisting in the management of the daily business and department operations (he was not responsible for management of SOC's overall business activities) [UMF #85];

(5) spending "most of the shift" prioritizing the daily work of assigned personnel, training to be conducted and the planning and execution of exercises [UMF #86];

(6) about 45 minutes per shift conducting mandatory security exercises and paperwork on those exercises [UMF #87];

(7) executing contingency plans, typically once a week; Gregory's role was to deploy subordinates, and Gregory did not perform the same activities as the subordinates, although they had a common goal [UMF #90];

(8) approximately 30-60 minutes at the end of a shift verifying reports [UMF #91];

(9) 60 minutes during each shift verifying logs and forms [UMF #91];

(10)  60 minutes of each shift interpreting policies and regulations and instructing subordinates on the daily instructions [UMF #92];

(11)  30 to 40 minutes of each shift reviewing policies and procedures [UMF #93];

(12)  maintaining skills, making plans and decisions, and controlling and directing the ProForce throughout his shift [UMF #94];

(13)  interacting with LANL once or twice a week regarding security [UMF #95];

(14)  scheduling SPOs and filling the shifts [UMF #96];

(15)  sometimes representing management during subordinates' grievance proceedings [UMF #97];

(16)  completing Reports of Inquiry for accidents and injuries—conducting investigations, taking statements, and making recommendations to upper management on ways to avoid further incidents [UMF #98];

(17)  completing Point of Observation Reports for subordinates who had engaged in misconduct and recommending disciplinary action; in February 2008, Gregory completed a Report of Inquiry for an SO and his recommendation of corrective counseling as discipline was followed [UMF #98].

All of the duties listed above are management or administrative duties.  *See* 29 C.F.R. § 541.102; 29 C.F.R. § 541.201.  As the Tenth Circuit observed, Captain Gregory performs "bona fide managerial duties" by "ensuring the operational readiness of his subordinates by performing checks and administering readiness tests."  *Maestas*, 664 F.3d at 831.  Plaintiffs do not dispute this record of Gregory's tasks and the amount of time devoted to each task.  Review of the time periods listed above shows that these duties would consume almost all of Captain Gregory's time.

Plaintiffs argue that all of the Plaintiffs "engage in the same front-line activities as their subordinates on a daily basis."  [Doc. No. 137, p. 10]  Plaintiffs generally assert that each of them is required to wear a uniform, wear a bulletproof vest, and carry a weapon just like the SOs and SPOs they supervise, "so they can be prepared to respond to an emergency situation at a

moment's notice."  [Doc. No. 137, pp. 10, 12]  Plaintiffs argue that Captain Gregory was a first responder because he testified that his "number one function" and his "first and major goal" is protecting the lab and its employees and property.  [Doc. No. 137, pp. 7-8; Doc. No. 137-14, p. 3]  Plaintiffs argue that a Captain faces the possibility of "'being placed in life-threatening and adverse situations while protecting and ensuring the safety of the public and national security.'" [Doc. No. 137, p. 6 (quoting Doc. No. 135-18, p. 3;  Doc. No. 135-19, p. 14)]

        To support the assertion that Gregory engaged in "the same front-line activities" as his subordinates on a daily basis, Plaintiffs cite testimony that Captain Gregory "described his job as including many responsibilities contained in the SPO and SO job descriptions, including preparing reports, conducting incident investigations and responding to alarms."  [Doc. No. 137, pp. 4-5]  But, as Defendants point out in their Reply, Plaintiffs' citations to the record do not fully support this assertion.  [Doc. No. 139, p. 5]  Gregory did not testify in the cited portions of the record that his job included many of the responsibilities of SPOs and SOs.  Instead, Gregory testified that:  he had conducted an investigation and prepared a Report of Inquiry [Doc. No. 135-19] after an SO slipped and fell; and he dropped whatever else he was doing to respond to an alarm.  [Doc. No. 137-8, pp. 1-2; Doc. No. 137-14, p. 3]  Defendants correctly point out that conducting investigations and preparing reports are not listed in the SPO and SO job descriptions. [Doc. No. 135-15, pp. 1, 4]  Conducting some investigations and preparing reports are listed as duties of SPO I Lieutenant and SASS Lieutenant.  [Doc. No. 135-18, p. 1; Doc. No. 135-19, p. 1] And wearing a uniform, in a paramilitary organization, does not show that Gregory was a first responder instead of a higher-level manager.  Major May also wore a uniform, but the Tenth Circuit did not find this a persuasive indication that May was a first responder; the Tenth Circuit

held that "it is clear that [May's] managerial duties are primary" and held that May is not a first responder. *See Maestas*, 664 F.3d at 831.

Gregory did testify that he responded immediately to alarms.  He testified that he would abandon any of his duties to respond to an alarm, because "the alarm is the most essential function" which takes precedence over any other of his functions.   [Doc. No. 137, pp. 13-14; Doc. No. 135-14, p. 4]  But the record does not show that Gregory himself performed first responder duties when he responded to alarms.  As the Tenth Circuit observed in *Maestas*, "directing the work of subordinates while simultaneously performing first responder activities does not qualify as a managerial duty"; "[o]n the other hand, 'directing operations' at an emergency scene is a managerial duty."  *Maestas*, 664 F.3d at 829 (emphasis added).  "The distinction appears to hinge on whether the supervisors engage in the same front-line activities as their subordinates on a daily basis."  *Id.* (emphasis added).  On this record, it appears that Captain Gregory did not engage in the same front-line activities, but instead "directed operations"—whether at the scene of the alarm or from a remote location—which is a management duty.

As the Tenth Circuit observed, some duties performed by high-ranking public safety officers are bona fide managerial duties.  *Maestas*, 664 F.3d at 829.  The Tenth Circuit noted that the Preamble to the new first responder regulation cited with approval a number of prior cases distinguishing between, on the one hand, high-level police and fire officials—whose primary duty is management—and, on the other hand, the type of employees described as first responders in 29 C.F.R. § 541.3; although these cases were decided before the first responder regulation was issued, they demonstrated the correct analysis on primary duty.  *Maestas*, 664 F.3d at 829; *Defining and Delimiting the Exemption for Executive, Administrative, Professional, Outside*

*Sales and Computer Employees*, 69 Fed. Reg. 22,122, at 22,130 (April 23, 2004) (available at 2004 WL 865626). One of the cases cited with approval is *Smith v. Jackson*, 954 F.2d 296 (5th Cir. 1992). *Smith* concerned district chiefs and battalion chiefs in the city fire department; each district chief oversaw thirty to forty employees in five to seven fire stations, and battalion chiefs were responsible for the business district and exercised authority over the district chiefs. *Id.* at 297. Each fire station had at least one captain. The district and battalion chiefs were regularly engaged in managerial and supervisory activities: checking on their district stations, compiling and reporting employee work hours, evaluating employees, reviewing firefighting plans, training and disciplining subordinate personnel. *Id.* at 299. The district and battalion chiefs responded only to substantial fires. When they did respond, they: assumed control of the scene and directed firefighting and lifesaving operations; decided whether additional equipment or personnel were needed; and decided whether an arson investigation was warranted. *Id.* at 297. These district and battalion chiefs participated "hands on" in the firefighting operation only on "infrequent occasions." *Id.* Although the chiefs did perform hands-on firefighting, this "infrequent" activity was not enough to make it their primary duty; the Fifth Circuit held that the chiefs were exempt executive or administrative employees. *Id.* at 299. *Smith* shows that the first responder regulation was not intended to make all police officers and fire officials non-exempt, and that such employees may perform some first responder activities without that being their primary duty.

As Captain, Gregory served as the Officer in Tactical Command ("OTC"). [UMF #99] As OTC, he was the lead commander in the field, ensuring that all safety and security procedures were "executed astutely and correctly during a threat." [UMF #99] Captains have input on the development of the exercises, security orders, and procedures. [UMF #99] As Captain,

Gregory's duty was to take charge of any situation.  Responding to alarms typically took between 15 and 40 minutes per shift.  [UMF #89]  All alarms were regarded as emergencies until proven otherwise.  [UMF #89]  A Captain receives a radio report of an emergency or security incident from an SPO; the Captain then goes to a remote location to assess the situation and coordinate the response by deploying troops.  [UMF #80, #89]  About half the time alarms required Gregory to go to the location of the alarm itself and the other half required him to go to an undisclosed location.  [UMF #89]   When he personally responded, subordinates also responded and he was in charge.  [UMF #89]  Captain Gregory would not be involved in personally addressing a threat unless it occurred in his immediate vicinity.  [UMF #80]  Gregory estimated that in a typical week there were four to five responses, including checking on alarms, that required him to deploy personnel; he estimated other types of emergency responses for him at about one a week, if that.  [UMF #88]

The current record before the Court shows that, in responding to alarms, Captain Gregory directed operations and deployed troops from a remote location about half of the time; this was a management duty, not a first responder duty.  And when Captain Gregory did to go the location of the alarm, subordinates also responded and the Captain was in charge.  [UMF #89]  Plaintiffs point to no evidence that Gregory himself performed first responder activities when he went to the location of the alarm.  The fact that Gregory dropped whatever he was doing to respond to an alarm is not enough to show that he was a first responder under the FLSA.  Gregory's activities show that he was not "simultaneously performing first responder activities" but instead was performing the management duty of "directing operations" at the scene of an alarm.  *Maestas*, 664 F.3d at 829.  Plaintiffs have not pointed to evidence that would support a finding that Gregory "engage[d] in the same front-line activities" as his subordinates on a daily basis."  *Id.*

16

Thus it appears that Gregory did not perform first responder duties.  To the extent that there is any uncertainty, further consideration confirms that Gregory was not a first responder.

The first factor to consider when determining the primary duty—the amount of time devoted to each task—weighs heavily in favor of a conclusion that Gregory's primary duty is management.  *See* 29 C.F.R. § 541.700(a) (listing four factors that the court may consider in determining employee's primary duty).  The undisputed evidence is that Captain Gregory spends virtually all, if not all, of his time on management tasks.

The second factor in the non-exclusive list set forth in 29 C.F.R. § 541.700(a) is "the relative importance of the exempt duties as compared with other types of duties."  In *Maestas*, the Tenth Circuit did not specifically discuss this factor before holding that Major May's primary duty was management; the Tenth Circuit's discussion of Major May suggests that the second factor also militates in favor of a conclusion that management is the employee's primary duty when the amount of the employee's time is taken up with management duties.  After the remand, the additional, detailed undisputed evidence presented by Defendants shows that, as was true for Major May, almost all of Captain Gregory's time is devoted to management tasks; the same conclusion appears appropriate—that the most important duties for Captain Gregory are also his management duties.  Plaintiffs point out their jobs are all directed toward the important purpose of "safely securing the special nuclear material, information, employees, and property from theft, sabotage, and destruction," and argue that what is most important to SOC is Plaintiffs' contribution to this purpose.  [Doc. No. 137, p. 11]  While this is the purpose of SOC as a whole, Plaintiffs' approach proves too much—allowing for no distinction between first responder tasks performed by SOs and SPOs, on the one hand, and the clearly management duties of the highest level of SOC management, on the other hand.  The highest level of management also contributes

to SOC's purpose—but their primary duty is still management, not securing nuclear material and protecting employees and personnel.  As Defendants point out in their Reply, in order to carry out SOC's mission of protecting LANL, the work is divided into different duties to be performed by different employees.  [Doc. No. 139, p. 7]  Some of these duties are directed to front-line protection, while other duties are directed to management of the business.

With regard to the third factor—the degree of freedom from direct supervision—the Tenth Circuit observed that, as the "lead commander in the zone," Gregory "certainly enjoys more freedom from direct supervision than a field lieutenant." *Maestas*, 664 F.3d at 831.  The Tenth Circuit also observed, however, that "the extent of this freedom is less than clear" and this observation still applies.

The fourth factor is the employee's pay relative to subordinates.  There was no evidence on Gregory's salary before the Tenth Circuit in *Maestas*.  On remand, Defendant has presented this Court with additional undisputed material facts.  In September 2010, when Gregory's employment ended, Gregory was paid $76,820; at that time, the average pay of SPOs was $55,016 and the highest paid SPO received $55,767.  [UMF #76]  The Tenth Circuit suggested that a 10% pay premium was not very significant.  *Maestas*, 664 F.3d at 830.  But Gregory received about 37% more than the highest paid SPO.

The Court concludes that "all reasonable factfinders would conclude that the managerial portions" of Gregory's job constitute his "primary duty." *Maestas*, 664 F.3d at 829.  Gregory is not a non-exempt first responder.  Gregory thus meets the "primary duty" requirement of an exempt executive employee under 29 C.F.R. § 541.100(a)(2).

A conclusion that Gregory is not a first responder does not end the inquiry.  Even if he is not a first responder, Defendants must carry their "heavy burden" of showing that all of the

requirements for an exemption are met before Gregory is an exempt employee who is not entitled to FLSA overtime protection.

Defendants must also show that Gregory meets the other requirements of 29 C.F.R. § 541.100(a).  Plaintiffs do not dispute that Gregory meets the "salary basis" requirement of being compensated not less than $455 per week, or that Gregory "customarily and regularly directs the work of two or more other employees."  29 C.F.R. § 541.100(a)(1), (3).  Gregory supervised three lieutenants and fifteen SPOs in Zone 1.  [UMF #78]

The fourth requirement for an executive employee is that the employee "has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight."  29 C.F.R. § 541.100(a)(4).  "To determine whether an employee's suggestions and recommendations are given 'particular weight,' factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon."  29 C.F.R. § 541.105.  Plaintiffs do not show that there is a genuine dispute on this point by citing facts supported by competent evidence.  *See Nahno-Lopez*, 625 F.3d at 1283. Defendants point out that Gregory had the duty of evaluating those he supervised and also investigating misconduct and recommending discipline; Defendants cite one occasion on which Gregory's recommendation for discipline was followed.  [UMF #82, #98; Doc. No. 135-1, p. 35; Doc. No. 135-19, p. 1, ¶ 1 (duty to evaluate performance of lieutenants)]  The job description for Gregory establishes one of his functions as participating on interview panels and providing recommendations for hiring.  [Doc. No. 135-19, p. 2, ¶ 4]  Since evaluating subordinates,

recommending discipline, and participating in interviews of prospective employees were all part of Gregory's job duties, and in the absence of any contrary evidence from Plaintiffs, the Court concludes that Gregory met the fourth requirement for an executive employee.

The Court concludes that Defendants have demonstrated that Gregory's managerial duties were primary, and that Gregory is exempt from FLSA overtime protections as an executive employee.  Defendants have demonstrated that they are entitled to summary judgment against Plaintiff Gregory.

**Lieutenant Maestas**

The Tenth Circuit stated that Maestas's managerial duties include those activities directed toward ensuring that his subordinates are well prepared.  *Maestas*, 664 F.3d at 830.  The undisputed facts show that Maestas spends a substantial part of every 8-hour shift performing such "management duties" under 29 C.F.R. § 541.102; the following facts are not disputed by Plaintiffs:

(1)  7 to 10 minutes inspecting troops during formation [UMF #26];

(2)  1 hour (typically the first hour of each shift) supervising the downloading and uploading of weapons and ammunition, initialing time sheets, or debriefing with the prior lieutenant [UMF #27];

(3)  2 to 4½ hours of post inspections (1st round typically taking 1½ to 3 hours; 2nd round taking ½ to 1½ hours) [UMF #28];

(4)  about 1 hour conducting OSPAs (On Shift Performance Assessments), and about 10 minutes on the related paperwork at end of the shift [UMF #30];

(5)  5 to 10 minutes verifying patrol reports [UMF #31];

(6)  preparing reports of inquiry and incident reports [UMF #37 (noting that it is undisputed that subordinates never prepare such reports)];

An additional management duty, performed less frequently, is:

(7)  30 to 45 minutes per week providing customer relations  [UMF #35].

Plaintiffs do not dispute that these are all management duties, which average out to about 4.5 to 7 hours of Maestas's 8-hour shift.  *See* 29 C.F.R. § 541.102 (management duties include:  training employees, directing work of employees, appraising employees' productivity and efficiency, controlling the flow and distribution of materials or supplies).   As the Tenth Circuit observed in *Maestas*, an employee performs "bona fide managerial duties" when the employee ensures "the operational readiness of his subordinates by performing checks and administering readiness tests."  *Maestas*, 664 F.3d at 831 (characterizing Captain Gregory's activities).   As the Tenth Circuit observed, "distributing and collecting weapons from subordinates" is also a management duty.  *Id.* at 831 (characterizing Major May's activities).

Plaintiffs argue, however, that there is a genuine dispute over both how they spent their time at work and over whether their activities qualify them as first responders.  [Doc. No. 137, p. 3]   Plaintiffs also dispute a number of Defendant's assertions of "undisputed material facts." [Doc. No. 137, pp. 3-8]

Plaintiffs dispute Fact No. 1, that every employee contributes to the mission, and imply that they directly "provide paramilitary security and protection of the people, facilities, and information" within LANL—as demonstrated by the fact that Plaintiffs are required to wear uniforms and carry weapons.  [Doc. No. 137, p. 3 (disputing Defendant's Fact No. 1)]

Plaintiffs agree that some of their duties are supervisory, but disagree with Defendants' statement that Defendants' UMFs and Plaintiffs' job descriptions—which are prepared by Defendants—include all of Plaintiffs' activities.  [Doc. No. 137, pp. 4-8 (disputing Defendant's Facts No. 4, 8, 13, 14, 24, 25, 32, 54)]   Plaintiffs dispute that their supervisory activities are primary, and cite duties—some of which are not included in their job descriptions—that they

21

argue qualify them as first responders:  (1) conducting investigations, (2) conducting random prohibited article inspections and investigating suspicious packages, (3) responding to alarms, (4) patrolling the premises, (5) escorting shipments, and (6) generally controlling and resolving security and safety incidents—providing "armed responses to security threats when necessary just 'like all the other SPOs.'"   [Doc. No. 137, pp. 4-6]   Plaintiffs also object to the characterization in Defendant's asserted UMFs of which of Plaintiffs' duties are "primary"; Plaintiffs correctly observe that this is a factual question to be resolved under the FLSA.  [Doc. No. 137, pp. 6-8 (disputing Defendant's Facts No. 21, 67, 70)]

The Tenth Circuit explained the distinction between first responders and higher-level supervisors:

> For field supervisors like plaintiffs, who direct the work of subordinates but also perform at least some first responder duties themselves, the distinction appears to be quite fine.  On one hand, directing the work of subordinates <u>while simultaneously performing first responder activities</u> does not qualify as a managerial duty.  On the other hand, "directing operations" at an emergency scene is a managerial duty.  The distinction appears to hinge on whether the supervisors <u>engage in the same front-line activities as their subordinates on a daily basis</u>.  *See* 29 C.F.R. § 541.3(b)(2) (a field supervisor who "also directs the work" of subordinates while engaging in front-line first responder activities herself is not exempt).

*Maestas*, 664 F.3d at 829 (emphasis added).   Plaintiffs argue that they are first responders because they "engage in the same front-line activities as their subordinates on a daily basis." [Doc. No. 137, p. 10]  As stated above, in arguing that there is a genuine material dispute about their activities, Plaintiffs argue that six of their duties show that they are engaged in first responder activities.   Although Marquez did not work full-time as an FOD Lieutenant, the activities to which he testified when working in that capacity are also relevant to Maestas; when they worked as FOD Lieutenants, they were performing the same job.

(1)   Conducting investigations:   Because this is a task listed in the first responder regulation, 29 C.F.R. § 541.3(b)(1), Plaintiffs assume that their performance of this task demonstrates that they are first responders.   "Thus, for example, a police officer or fire fighter whose primary duty is to investigate crimes or fight fires is not exempt . . . merely because the police officer or fire fighter also directs the work of other employees in the conduct of an investigation or fighting a fire."   29 C.F.R. § 541.3(b)(2) (emphasis added).   The reason that a police officer may be a first responder in this example is that both the supervisor and the front-line employee have the duty of conducting investigations for violations of law.   *See Reich v. New York*, 3 F.3d 581, 585-88 (2d Cir. 1993) (investigators were not exempt administrative employees, because both troopers and investigators who supervised them had duty to investigate crime).   But the same point does not hold for Plaintiffs.   The SOs and SPOs whom Plaintiffs supervise do not have the duty of "conducting investigations" for violations of law.   [Doc. No. 135-15, pp. 1, 4 (job descriptions of SPOs and SOs)]   When Plaintiffs conduct investigations they are not, therefore, engaging in "the same front-line activities as their subordinates." *Maestas*, 664 F.3d at 829.   The fact that Plaintiffs conduct investigations does not support their argument that they are first responders.

(2)   Conducting random prohibited article inspections and investigating suspicious packages:   Maestas testified that he conducts random prohibited article inspections and investigates suspicious packages.   [Doc. No. 137, p. 4; Doc. No. 137-2, p. 253; Doc. No. 137-5, p. 3]   Marquez also testified that he conducted random prohibited article inspections.   [Doc. No. 137-2, p. 253]   Although, as Defendants point out [Doc. No. 139, p. 2], Marquez's testimony was somewhat unclear, Marquez did say that he knew he had conducted them, and was sure he had done so.   [Doc. No. 137-2, p. 253]   Questions of credibility and inferences from the testimony

are for the factfinder at trial; on Defendants' motion for summary judgment, this Court views the evidence in the light most favorable to Plaintiffs and indulges in all reasonable inferences in favor of Plaintiffs.  Under this standard, testimony by both Maestas and Marquez shows that they perform this front-line activity—which is listed as one of the duties of SOs and SPOs.  [Doc. No. 135-15, pp. 1, 4]  The record does not, however, show that this duty was performed frequently.

(3)  Responding to alarms:  "Responding to an alarm is a higher priority than completing paperwork, doing post checks, and conducting OSPAs."  [UMF #16]  This is a front-line activity for SOs and SPOs which is also performed by Maestas and Marquez.  [UMF #34, Doc. No. 135-6, p. 3; Doc. No. 137-1, p. 2; Doc. No. 137-3, p. 3]  Plaintiffs testified that they drop whatever they are doing and respond to the alarm.  [Doc. No. 137, p. 13; Doc. No. 137-1, p. 2; Doc. No. 137-3, p. 3]  "Alarms occur several times a week, and sometimes there are several in a day."  [UMF #34]  Defendants argue that Maestas and Marquez respond differently to alarms than SOs and SPOs, because the lieutenants "independently decide the best use of manpower and equipment to respond to the call"; lieutenants determine whether SPOs are at their correct posts and may reposition SPOs.  [UMF #34; Doc. No. 139, p. 3]  These points show performance of a management duty.

When lieutenants respond to an alarm, they are in uniform and armed, just like the SPOs they supervise.  UMF #34 also states that lieutenants may fill in at an SPO post themselves, investigate the cause of an alarm, or require SPOs to investigate it; these points demonstrate that lieutenants are performing the same front-line activities as their subordinates.  Defendants argue that lieutenants are expected to remain in charge whenever possible, and that this "is different from the subordinate response"; this argument is misguided, as Plaintiffs observe.  [Doc. No. 139, p. 3; Doc. No. 137, p. 9]  A uniformed and armed lieutenant is performing first responder duties

when he responds to alarms, just as SPOs and SOs do, and despite the fact that a lieutenant "also directs the work of other employees" while responding to the alarm.  29 C.F.R. § 541.3(b)(2).  In addition, Marquez testified that in responding to a threat:  "I respond just like all the other SPOs. If I need to take action, then I take action."  [Doc. No. 137-4, p. 1]  Although Defendants argue that this testimony is "unreliable" and that it does not create a disputed issue of fact, this Court views the evidence in the light most favorable to Plaintiffs, and does not make credibility judgments in deciding the summary judgment motion.  [Doc. No. 139, p. 3]

Responding to alarms is an important and frequent duty.  A reasonable factfinder could conclude that Maestas and Marquez are performing front-line duties when they respond to alarms. *See Maestas*, 664 F.3d at 829 (summary judgment standards).

(4)  Patrolling the premises:  Marquez testified that patrolling the premises was an important part of his duty to ensure the safety and security of LANL.  [Doc. No. 137-3, p. 1; Doc. No. 137-2, p. 3]  Plaintiffs argue that Plaintiffs "'observe their surroundings and look for signs of security breaches,' while performing their supervisory duty of conducting post checks."  [Doc. No. 137, p. 12]  Major May testified that the "lieutenants are out patrolling just like the other guys are."  [Doc. No. 135-16, p. 3]  Patrolling is one of the front-line activities for SOs and SPOs. [Doc. No. 135-15, pp. 1, 4]  Defendants argue that patrolling is not listed in the lieutenants' job descriptions, and rely on an undisputed fact that "Lieutenants do not have required patrols." [Doc. No. 139, pp. 2-3; UMF # 31]  Although Defendants also rely on their UMF #70, Plaintiffs dispute this fact.  [Doc. No. 137, p. 8]  Defendants point out that Marquez only spent about 19% of his time as an FOD Lieutenant.  [Doc. No. 139, p. 2]  Patrolling does not appear to be a frequent activity, and is not listed in the lieutenant's job descriptions; the Court does not place much emphasis on Marquez's testimony as demonstrating that lieutenants engage in the same

front-line activities for SOs and SPOs.  The Court notes, however, that a "reasonable factfinder" could infer from Marquez's testimony that there was an unofficial practice for lieutenants to patrol, and to perform essentially the same function by being on the lookout for problems or security breaches as they went about their other activities—even though the latter was not officially "patrolling."

(5)  Escorting shipments:  Maestas testified that he sometimes escorts shipments, which could take as long as a whole shift.  [Doc. No. 135-6, p. 11]  Escorting shipments is listed as a duty of SPOs.  [Doc. No. 135-15, p. 1]  Maestas estimated that this duty occurred two or three times a month.  [Doc. No. 135-6, p. 11]  Defendants state that the records show that in the first six months of 2012 Maestas performed escort duties only once.  [UMF #36]  Defendants' review of the records casts doubt on the frequency of this activity for only one six-month period.  Under the standard for reviewing the evidence on a summary judgment motion, this evidence provides some support for Plaintiffs' claim of acting as first responders.

(6)  Generally controlling and resolving security and safety incidents:  Plaintiffs argue that they provide "armed responses to security threats when necessary just 'like all the other SPOs.'"  [Doc. No. 137, p. 4]  Maestas testified that one of his duties was to handle safety and security incidents—including an unsecured access point, positive alarm results, vehicle accidents, questionable substances, altercations, and medical emergencies; Maestas estimated that such incidents occurred between once a week and once a month.  [Doc. No. 135-8, p. 1; UMF #38]  Defendants state that the records show that between January 2007 and July 2012, Maestas was involved in "approximately one incident a month, although a few times there was more than one incident a month."  [UMF #38]  Major May testified that the "lieutenants are out there patrolling just like the other guys are," and could be the one "that's actually stumbling on a situation" that

he has to handle.  [Doc. No. 135-16, p. 3]  Responding to such incidents is one of the duties listed for SOs and SPOs.  [Doc. No. 135-15, pp. 1, 4]  Defendants argue that the lieutenant's role is to make assessments, determine deployment or addition of troops, and generally remain in charge.  [UMF # 38-43]  Despite this role, a reasonable factfinder could rely on this evidence to find that a lieutenant is acting as a first responder in such situations, remaining in charge while engaging in the same front-line activities as his subordinates.

Plaintiffs argue generally that front-line law enforcement is their primary duty, as demonstrated by the requirement that they wear uniforms and carry weapons, just like the SOs and SPOs they supervise.  [Doc. No. 137, pp. 12-13]  Plaintiffs state:  "Each one of them is required to wear a uniform, wear a bullet proof vest and carry a weapon, so they can be prepared to respond to an emergency situation at a moment's notice."  [Doc. No. 137, p. 10]  Wearing a uniform, in a paramilitary organization, does not distinguish between front-line first responders and high-level managers; despite the fact that Major May wore a uniform, the Tenth Circuit held that he was not a first responder.  [Doc. No. 75, p. 21]  *See Maestas*, 664 F.3d at 825, 831 (stating that field supervisors—including lieutenants, captains, and majors—"like all members of the force, wear uniforms").  The fact that Maestas and Marquez wear bulletproof vests and carry weapons, however, does tend to support the claim that these two lieutenants engage in front-line activities.

Plaintiffs argue that a further showing that their primary duty is front-line law enforcement is that it is their duty to drop whatever they are doing to respond immediately to any alarms.  [Doc. No. 137, pp. 12-13]  But what is critical is what role the officers perform when they respond.  As the Tenth Circuit observed, the critical issue is whether the officers direct operations at an emergency scene—a managerial duty—or "engage in the same front-line

activities as their subordinates on a daily basis." *Maestas*, 664 F.3d at 829.  Captain Gregory, like Maestas and Marquez, testified that it was his duty to drop whatever he was doing and respond immediately to an alarm.  But, as discussed above, Gregory did not engage in front-line activities when he did so; instead, he directed operations—about half the time from a remote location.  Thus the duty to respond immediately to an alarm does not distinguish first responders from higher-level executive employees.

In determining Maestas's primary duty, the Court considers the factors set forth by 29 C.F.R. § 541.700.  First, it appears that Maestas devotes a substantial amount of time (about 4.5 to 7 hours of his 8-hour shift) to managerial tasks.  Second, although Defendants have provided much additional information, the observation made by the Tenth Circuit in *Maestas* is still applicable:  "The relative importance of Maestas' managerial, administrative, and first responder duties is debatable."  *Maestas*, 664 F.3d at 830.  As Plaintiffs argue, in view of the primary purposes of security and protection of LANL, a reasonable factfinder could find that it is extremely important to have armed lieutenants ready to immediately respond to alarms or security threats, and to direct the work of their subordinates while at the same time being ready and able to perform the same duties as those subordinates—first responder duties.  Third, as the lowest level of officers, these lieutenants have not been shown to have a significant degree of freedom from direct supervision.  Captains and higher level officers also respond to emergencies and take charge when they do.  The observation by the Tenth Circuit in *Maestas* is still applicable:  "[T]he strict hierarchical structure of the security force also suggests that field lieutenants do not enjoy significant freedom from supervision."  *Maestas*, 664 F.3d at 830.  The fourth factor relevant to a determination of primary duty is the employee's salary in comparison to subordinates.  Maestas received a 10% raise when he was promoted to FOD Lieutenant.

[UMF #19]  Marquez received a 10% raise when he was promoted to SASS Lieutenant.  [UMF #53] The Tenth Circuit indicated that this was not a significant salary compared to that of subordinates, stating that lieutenants receive "<u>only</u>" ten percent more than their subordinates. *Maestas*, 664 F.3d at 830 (emphasis added).

Considering these four factors, the Court cannot conclude that "all reasonable factfinders would conclude that the managerial portions" of Maestas's job were his primary duties.  Viewing the record in the light most favorable to Plaintiffs, and indulging in all reasonable inferences in their favor, the Court concludes that a reasonable factfinder could find that Maestas's primary duty was as a first responder.  Maestas engages in first responder activities frequently, and his supervision during alarms and emergencies relates to the same duty of protection performed by SOs and SPOs.  *Cf. Smith*, 954 F.2d at 297-99 (district and battalion chiefs performed "hands on" front-line duties only on "infrequent occasions" and did not have front-line duties as their primary duties); *Mullins v. City of New York*, 653 F.3d 104, 117-19 (2d Cir. 2011) (per curiam) (although police sergeants perform some duties not handled by subordinate police officers, the sergeants' duties relate to their law enforcement tasks; sergeants were first responders performing law enforcement duties alongside patrol officers in the field).

In addition, the regulations stress that the "major emphasis" in determining an employee's primary duty must be on "the character of the employee's job as a whole."  29 C.F.R. § 541.700(a).  A reasonable factfinder could find that the function most important to the employer was Maestas's readiness and ability to immediately respond to alarms or security threats, directing his subordinates while simultaneously performing the same first responder duties as those subordinates.  *See Mullins*, 653 F.3d at 118-19 (although police sergeants perform some management duties, their "principal benefit" is their "performance of law enforcement

duties in the field and concomitant supervision of lower-ranking officers while performing such duties").  Defendants have not carried their "heavy burden" of "producing evidence that 'plainly and unmistakably'" shows that Maestas is an exempt executive employee under the FLSA. Defendants have therefore not demonstrated that they are entitled to summary judgment against Maestas.

**Lieutenant Marquez**

Plaintiff Marquez was hired as an SPO II in January 2005 and promoted to "Shift Administration & Systems Supervisor" (SASS) Lieutenant in September 2006; his employment ended on December 7, 2010.  [UMF # 51]  On average, Marquez worked 88% of his time as SASS Lieutenant in the years 2007 through 2010.  [UMF # 68]

Marquez was a "scheduling specialist."   [UMF #55]  Working at headquarters—not in the field—Marquez performed the following duties as SASS Lieutenant:

 (1)  scheduling the SPOs and SOs, handling requests for time off, ensuring that CBA provisions are followed and enforced as to overtime and other assignments, quickly responding to changes in personnel availability during a shift, ensuring that each post is staffed with a properly certified SPO or SO; these scheduling duties are performed in every shift [UMF #55, #57];

(2)  initiating discipline for subordinates when they attempted to take posts for which they were not eligible [UMF #58];

(3)  completing a Point of Observation Report (POR) for an SPO who failed to appear for required training; Marquez investigated and made a recommendation for a Letter of Reprimand, which Marquez then issued [UMF #59];

(4)  responding to issues arising during fitness-for-duty inspections, including reorganizing assignments or initiating discipline [UMF # 60];

(5)  interpreting policies and regulations and advising others on them [UMF #61];

(6)  inspecting personnel during formation in every shift and monitoring their fitness for duty, and assisting the shift commander at muster [UMF #63];

(7)  participating in issuance of weapons and inventory [UMF #64];

(8)  reviewing patrol reports submitted by SPOs and SOs [UMF #72].

These duties are primarily administrative duties, although some could arguably be executive or a combination of the two.  *See* 29 C.F.R. §§ 541.100, 541.102, 541.200, 541.201.  Plaintiffs have not come forward with evidence to show that there is a genuine dispute on whether Marquez meets the other requirements of the administrative or combination exemption.  *See* Fed. R. Civ. P. 56(c)(1); *Nahno-Lopez*, 625 F.3d at 1283 (party opposing summary judgment cannot rely on allegations of complaint or conclusory legal statements).  The only issue Plaintiffs have placed before the Court is whether Marquez is a non-exempt first responder.

As a SASS Lieutenant, Marquez also performed some duties which could be first responder duties:

(1)  responding to an emergency, rarely [UMF #65];

(2)  responding to an alarm about ten times a month as a SASS Lieutenant [UMF #66];

(3)  walking the headquarters building and checking the nearby fences during his SASS shifts [UMF #67].  Marquez testified that he got up at least once an hour to walk the building, look around outside, or secure a room.  [Doc. No. 135-11, p. 8]

Defendants have not presented detailed evidence on how much of Marquez's time was spent on these first responder duties.

Marquez split his time between SASS and FOD Lieutenant shifts.  [UMF #68]  The records show that from January 1, 2007 to December 7, 2010, Marquez spent an average of 12% of his time working FOD shifts.  [UMF #68]  The percentages in each year were:  19% in 2007, 17% in 2008, 9% in 2009, and 6% in 2010.  [UMF #68]

Defendants argue that Marquez is an exempt administrative employee or an exempt combination employee.  [Doc. No. 135-1, pp. 36-39; Doc. No. 139, p. 10]  *See* 29 C.F.R. §§ 541.200, 541.202, 541.708 (employee performing combination of administrative and executive duties may be exempt).

As FOD Lieutenant, Marquez performed substantially the same duties as Lieutenant Maestas.  [UMF #69]  As discussed above, these duties included some which a reasonable factfinder could find were first responder duties.  But since Marquez only spent an average of 12% of his time working FOD shifts, he spent less time on the first responder duties of an FOD Lieutenant.

In *Maestas*, the evidence then before the Tenth Circuit was that Marquez spent 50% to 60% of his time as an FOD Lieutenant.  *Maestas*, 664 F.3d at 830.  The Tenth Circuit stated that Marquez's office duties as scheduling specialist were administrative, but that "there remain genuine questions about which of his duties are primary" given this division of time.  *Id.*  The Tenth Circuit determined that Defendants had failed to carry their burden of demonstrating that they were entitled to summary judgment against Marquez for "substantially the same reasons" as against Maestas; a "reasonable factfinder could conclude that Marquez's primary duties were first response."  *Id.*

The record currently before the Court is different.  Marquez spent from 19% to 6% of his time as an FOD Lieutenant.  On the other hand, the record also shows that Marquez spent time on what could be found to be first responder duties while otherwise performing the duties of an SASS Lieutenant:  responding to an emergency (though rare); responding to an alarm about ten times a month; and patrolling through the headquarters building and outside, sometimes securing a room.  The current record is deficient in the same way as the record before the Tenth Circuit:

the record does not sufficiently show how Marquez divided his time.  Even though it appears that Marquez's first responder activities while acting as SASS Lieutenant did not amount to a great percentage of his time, the record is not as clear as it should be to demonstrate entitlement to summary judgment.

The first factor in determining Marquez's primary duty nevertheless appears to suggest that Marquez spent significantly less time than Maestas on first responder duties than on administrative and executive duties.  *See* 29 C.F.R. § 541.700(a) (factors relevant to determination of primary duty).   But especially for the year in which Marquez spent 19% of his time as FOD Lieutenant, a reasonable factfinder could find that the amount of time devoted to first responder duties was significant.  Regarding the second factor, the Court makes the same conclusion as for Maestas.  Although Defendants have provided much additional information, the observation made by the Tenth Circuit in *Maestas* is still applicable:   "The relative importance of [Marquez's] managerial, administrative, and first responder duties is debatable." *Maestas*, 664 F.3d at 830.  As Plaintiffs argue, in view of the primary purposes of security and protection of LANL, a reasonable factfinder could find that it was extremely important to have armed lieutenants ready to immediately respond to alarms or security threats, and to direct the work of their subordinates while at the same time being ready and able to perform the same duties as those subordinates—first responder duties.  Third, as the lowest level of officers, these lieutenants have not been shown to have a significant degree of freedom from direct supervision. Captains and higher level officers also respond to emergencies and take charge when they do. The observation by the Tenth Circuit in *Maestas* is still applicable:   "[T]he strict hierarchical structure of the security force also suggests that field lieutenants do not enjoy significant freedom from supervision."  *Maestas*, 664 F.3d at 830.  The fourth factor relevant to a determination of

primary duty is the employee's salary in comparison to subordinates.  Marquez received a 10%
raise when he was promoted to SASS Lieutenant.  [UMF #53]  The Tenth Circuit indicated that
this was not a significant salary increase compared to that of subordinates, stating that lieutenants
receive "only" ten percent more than their subordinates.  *Maestas*, 664 F.3d at 830 (emphasis
added).

Marquez may devote less time to his first responder duties than Maestas, making this a
closer decision—even though Marquez testified that he did perform first responder duties while
performing his SASS duties.  Considering the four factors, however, again viewing the evidence
in the light most favorable to Plaintiffs, and again placing heavy emphasis on the "character of
[Marquez's] job as a whole," the Court cannot conclude that "all reasonable factfinders" would
find that the administrative or executive portions of Marquez's job were his primary duties.  A
reasonable factfinder could instead find that Marquez's primary duty was as a first responder,
determining that the most important duty was Marquez's readiness and ability to immediately
respond to alarms or security threats, directing subordinates while simultaneously performing the
same first responder duties as those subordinates.

Defendants have not carried their "heavy burden" of "producing evidence that 'plainly
and unmistakably'" shows that Marquez is an exempt administrative or combination employee
under the FLSA.  Defendants have therefore not demonstrated that they are entitled to summary
judgment against Marquez.

## CONCLUSION

Defendants have demonstrated that Captain Gregory is an exempt executive employee
who is not entitled to the overtime protections of the FLSA.  **IT IS THEREFORE ORDERED**

that *Defendants' Second Motion for Summary Judgment* [Doc. No. 135] is **GRANTED** with respect to Plaintiff Gregory.

Defendants, however, have not carried their "heavy burden" of demonstrating "plainly and unmistakably" that Maestas and Marquez are exempt employees under the FLSA.  **IT IS THEREFORE ORDERED** that *Defendants' Second Motion for Summary Judgment* [Doc. No. 135] is **DENIED** with respect to Plaintiffs Maestas and Marquez.


_____
UNITED STATES DISTRICT JUDGE